## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| BLACKSMITH INVESTMENTS, LLC,     ) | |
|     ) | |
| Plaintiff/Defendant-In-Counterclaim,     ) | CIVIL ACTION NO. 05-11567-NG |
|     ) | |
| v.     ) | |
|     ) | |
| CIVES STEEL COMPANY,     ) | |
|     ) | |
| Defendant/Plaintiff-In-Counterclaim.     ) | |

### AFFIDAVIT OF STEPHEN C. BAZARIAN
### in support of
### CIVES' MOTION FOR SUMMARY JUDGMENT

I, Stephen C. Bazarian, Esq. on oath depose and state that:

1.    I am an attorney at Seyfarth Shaw LLP, the law firm representing defendant/plaintiff-in-counterclaim Cives Corporation (sued herein as "Cives Steel Company") ("Cives") in this action.

2.    I submit this Affidavit in support of Cives' Motion For Summary Judgment against plaintiff/defendant-in-counterclaim Blacksmith Investments, LLC ("Blacksmith").

3.    Attached at **Exhibit A** is a true, complete and accurate copy of the July 17, 2002, subcontract between Cives and BSE ("Cives/BSE Contract"). The Contract is attached to a copy of the Affidavit of Martin C. Keniston in Support of Defendant's Motion to Dismiss filed in Blacksmith's previous litigation against Cives styled as *Blacksmith Investments, LLC v. Cives Steel Co., Inc.*, U.S.D.C., Docket No. 04-10369-NG."

4.    Attached at **Exhibit B** is a true, complete and accurate copy of the January 29, 2002, Demand Revolving Discretionary Line Of Credit Note ("Note") executed by Boston Steel

Erectors and its affiliated companies (collectively "BSE") in favor of Citizens Bank of

Massachusetts.

     5.    Attached at **Exhibit C** is a true, complete and accurate copy of the January 29,

2002, Loan and Security Agreement executed by BSE in favor of Citizens Bank.

     SIGNED UNDER THE PAINS AND PENALTIES OF PERJURY THIS 7TH DAY OF

MAY 2007.

                    /s/ Stephen C. Bazarian
                    Stephen C. Bazarian

### Certificate of Service

     I hereby certify that this document(s) filed through the ECF system on May 7, 2007, will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF).

                    /s/ Stephen C. Bazarian
                    Stephen C. Bazarian

BO1 15845206.1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| BLACKSMITH INVESTMENTS, LLC, | : | |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | | Docket No. 04 10369 NG |
| | : | |
| CIVES STEEL CO., INC., NEW ENGLAND DIVISION, | : | |
| | : | |
| Defendant. | : | |

---

**AFFIDAVIT OF MARTIN C. KENISTON**
**in support of**
**DEFENDANT'S MOTION TO DISMISS**

I, Martin C. Keniston submit this affidavit in support of the motion of the

defendant Cives Corporation (sued herein as Cives Steel Co., Inc., New England

Division), to dismiss the February 19, 2004 Complaint of the plaintiff Blacksmith

Investments, LLC ("Blacksmith").

1.    I am and was the Manager of Cives' Accounting Department at the time Cives

retained Boston Steel Erectors, Inc. ("BSE").  As Cives' Accounting Manager,

I am responsible for maintaining a true and accurate copy of the July 17, 2002

subcontract between Cives and BSE (the "Contract").  Attached is a true and

accurate of same.

Signed this 30ᵗʰ day of July, 2004 under the pains and penalties of perjury.

Martin C. Keniston
Manager of Accounting
Cives Corporation

On this 25th day of July, 2004, before me, the undersigned notary public, personally appeared Martin C. Keniston, and proved to me through satisfactory evidence of identification which was his driver's license, to be the person who signed the within Affidavit and who swore or affirmed to me that he is the Accounting Manager of Cives Corporation and that he is authorized to sign the within Affidavit on behalf of said corporation and that the Affidavit's contents are truthful and accurate to the best of his knowledge and belief.

NOTARY SEAL

_John William Hall_

JOHN WILLIAM HALL
Notary Public, Maine
My commission expires My Commission Expires November 2, 2010

## CERTIFICATE OF SERVICE

This is to certify that I have this day served upon the opposing party in this action, the within Affidavit of Martin C. Keniston in Support of Defendant's Motion To Dismiss The Complaint via United States Mail, with proper postage affixed, addressed to the following:

Guy E. Guarino, Esq.
BBO No. 213960
72 Country Club Way
Ipswich, Massachusetts 01938

This 9th day of August, 2004.

Attorney for Defendant Cives Corporation

_Joseph A. Barra_

Joseph A. Barra
BBO# 632534
Gadsby Hannah, LLP
225 Franklin Street
Boston, MA 02110
jbarra@ghlaw.com
(617) 345-7061

2

# Subcontract Agreement

Subcontract Agreement #: 970
Subcontract Agreement Date: 7/17/02



**(Herein "Contractor")**
**Subcontractor:**

**Boston Steel Erectors**
**910R Broadway Route 1N**
**Saugus  MA  01906-3204**

The above Subcontract Agreement Number must appear on all invoices, correspondence and other documents.

Performance by Subcontractor of any part of the Scope of Work set forth below constitutes acceptance of this Subcontract Agreement ("Subcontract"), including all Subcontract Provisions ("Subcontract Provisions") and all Subcontract Terms and Conditions, including attached Exhibits, set forth below ("Subcontract Terms") which together will constitute the entire agreement between the parties hereto.

## SUBCONTRACT PROVISIONS

1. Scope of Work
Furnish all labor, equipment and supervision to receive, unload and erect the structural steel and metal deck and furnish and install all shear studs in accordance with the subcontract documents for the Manulife Financial Center Building in Boston, Massachusetts.
The subcontract documents shall consist of this subcontract purchase order (including attached Exhibit "A"), the agreement between the contractor (Clark/Suffolk) and subcontractor (Cives Steel), the agreement between the owner and contractor, and the subcontract drawings listed in Exhibit "A". These form this subcontract and are as fully a part of this subcontract as if attached to this agreement or repeated herein.

2. Project Site Location and Shipping Instructions
Clark/Suffolk
601 Congress Street
Boston MA 02210

3. Contract Documents
Structural drawings per Exhibit A.  Structural Steel Specification Section 05120 dated 7/16/01, pages 1 – 14.
Steel Deck Specification Section 05310 dated 7/16/01, pages 1 – 6.
(Copies of the above already in your possession).

4. Schedule
Start anchor bolt survey 7/1/02
Start setting baseplates w/o 7/22/02
Start erection of garage columns and ground floor w/o 7/22/02
Start erection of Level 2 and Tower 9/16/02 – Hang by 1/21/03. *Completed by 2/25/03* ①

5. Price and Payment Terms *Per Proposal*
~~For price, see Exhibits "B" and "C"~~  ✍
~~Pencil copy of requisition to be submitted by 15th of each month for value through the end of the month~~
~~Hard copy to be submitted upon approval of pencil copy by the owner.~~

6. State Sales/Use Taxes
Not included.

7. Quality Assurance
Erection parameters, plumbing of building, etc. per contract documents.

8. Miscellaneous Requirements
Subcontractor will perform the Work in compliance with the 29 CFR 1926 Part R standards, and will furnish a written erection plan to Contractor which addresses any special lifts.

Exhibit "A" to Subcontract Purchase Order #970
Manulife Financial Headquarters, Boston, MA
Structural Steel Bid Drawings (thru Addendum #5)

| Drg. | Rev# |
|------|------|
| S001 | 3 |
| S002 | 4 |
| S003 | 3 |
| S004 | 4 |
| S100 | 5 |
| S101 | 2 |
| S102 | 2 |
| S103 | 2 |
| S104 | 2 |
| S105 | 2 |
| S106 | 2 |
| S107 | 2 |
| S108 | 2 |
| S109 | 2 |
| S110 | 2 |
| S111 | 2 |
| S112 | 2 |
| S113 | 2 |
| S114 | 2 |
| S115 | 2 |
| S116 | 2 |
| S200 | 3 |
| S201 | 3 |
| S202 | 4 |
| S203 | 3 |
| S205 | 2 |
| S206 | 3 |

| Drg. | Rev# |
|------|------|
| S300 | 2 |
| S301 | 1 |
| S302 | 1 |
| S303 | 2 |
| S304 | 3 |
| S305 | 3 |
| S306 | 2 |
| S307 | 1 |
| S500 | 2 |
| S501 | 2 |
| S502 | 2 |
| S503 | 4 |
| S504 | 4 |
| S504A | 2 |
| S505 | 2 |
| S506 | 2 |
| S507 | 2 |
| S508 | 2 |
| S509 | 2 |
| S510 | 1 |

|  | EXHIBIT "B" TO SUBCONTRACT PURCHASE ORDER #970 |  |  |  |  |  |
|---|---|---|---|---|---|---|
|  | **MANULIFE ERECTION BASE BID** |  |  |  |  |  |
|  |  |  |  |  |  |  |
| ITEM |  | BOSTON STEEL |  |  |  |  |
|  |  |  |  |  |  |  |
| BASE |  | $3,200,000.00 |  |  |  |  |
| GARAGE |  | $100,000.00 |  |  |  |  |
| ALLOWANCES |  | $46,900.00 |  |  |  |  |
| ATRIUM |  | $110,000.00 |  |  |  |  |
| LIGHT BOX/4TH FLR. |  | $20,000.00 |  |  |  |  |
| ADD # 5 |  | $155,000.00 |  |  |  |  |
| 1/7/02 |  | -$200,000.00 |  |  |  |  |
| 1/9/02 |  | -$120,000.00 |  |  |  |  |
| BASE PLATES |  | $25,000.00 |  |  |  |  |
| NETS |  | $30,000.00 |  |  |  |  |
| TOTAL |  | **$3,366,900.00** |  |  |  |  |
| Exhibit "C" |  | $167,450 |  |  |  |  |
| TOTAL | CONTRACT AMOUNT | $3,534,350 |  |  |  |  |



| | | | EXHIBIT "C" TO SUBCONTRACT PURCHASE ORDER #970<br><br>MANULIFE FINANCIAL SCOPE CHANGES | | | | | |
|---|---|---|---|---|---|---|---|---|
| | | | | | | | | |
| CHANGE | | | | | | | | ERECTION |
| 1.)NON-DESTRUCTIVE TESTING OF WELDS(SUBJECT TO AVAILABILITY) | | | | | | | | $0.00 |
| 2.)ECCENTRIC BRACE DETAIL(ADDED STIFFENERS) | | | | | | | | $0.00 |
| 3.)W12X40 COLUMNS (LOWER LEVEL ONE TO B3) | | | | | | | | $0.00 |
| 4.)EXPOSED FRAMING (DRG. S-114) GALVANIZED | | | | | | | | $0.00 |
| 5.)CANOPY SUPPORT TUBES | | | | | | | | $12,500.00 |
| 6.)SKEWED CONNNECTIONS | | | | | | | | $0.00 |
| 7.)EXTEND & TAPER CONTINUITY PLATES | | | | | | | | $0.00 |
| 8.)PRIME EXPOSED FRAMING(DRG.S-114) IN LIEU OF GALVD. | | | | | | | | $0.00 |
| 9.)ATRIUM DELETE ROOF PURLINS (HSS12X6) | | | | | | | | $0.00 |
| 10.)ATRIUM DELETE HORIZ. WINDOW TRUSSES (25 TRUSSES) | | | | | | | | -$43,000.00 |
| 11.)ADDENDUM # 14   (ADD THREE DAYS TO ERECTION SCHEDULE) | | | | | | | | $36,000.00 |
| 12.)ADDENDUM # 16 | | | | | | | | $600.00 |
| 13.) EXTERIOR TOWER CRANE (REVISED TO BALLAST FRAME) | | | | | | | | $120,000.00 |
| 14.) ADDENDUM #18 | | | | | | | | $0.00 |
| 15. ) ADDENDUM #19 | | | | | | | | $27,000.00 |
| 16.) ADDENDUM #13 &RFI#043 &RFI#077 | | | | | | | | $0.00 |
| 17.) DELETE ALLOWANCES | | | | | | | | -$46,900.00 |
| 18.)LABOR INCREASES | | | | | | | | $61,250.00 |
| | | | | | | | | $167,450.00 |
| | | | | | | | | |
| ALTERNATE (Not Exercised) | | | | | | | | |
| DELETE CANOPY SUPPORT TUBES | | | | | | | | -$28,000.00 |

# SUBCONTRACT TERMS AND CONDITIONS

1.    Subcontractor's Work

    a.    Subcontractor shall perform all work and shall furnish all supervision, labor, materials, plant, hoisting, scaffolding, tools, equipment, supplies and all other things necessary for the construction and completion of the work described in Paragraph 1 of the Subcontract Provisions and work incidental thereto (hereinafter "Work"), in strict accordance and full compliance with the terms of this Subcontract, and to the satisfaction of Contractor and Owner. "Owner" means the party with whom Contractor has contracted to perform Contractor's scope of work, as well as the actual Owner of the overall project.

    b.    Subcontractor has received and reviewed all Contract Documents listed in Paragraph 3 of the Subcontract Provisions. In respect of work covered by this Subcontract, and except as expressly modified herein, Subcontractor shall assume toward the Contractor all obligations, risks and responsibilities which Contractor has assumed towards Owner in the Contract Documents and shall be bound to the Contractor in the same manner and to the same extent the Contractor is bound to the Owner by the Contract Documents, provided that where any portion of the Contract Documents between the Owner and Contractor is inconsistent with any portion of the Subcontract Provisions or Subcontract Terms, then the Subcontract Provisions and Subcontract Terms shall govern. *Please send For Review + Approval (D) ✓ OK 8/2*

2.    Payment

    a.    Contractor shall pay Subcontractor for performance of the Work, subject to additions and deductions by change order, the Subcontract Price as set forth in Paragraph 5 of the Subcontract Provisions.

    b.    Unless otherwise set forth under the Subcontract Provisions, monthly partial payments shall be due Subcontractor in the amount of 90% of the Work in place, and for which payment has been made to Contractor by Owner. Subcontractor shall submit an Application For Payment, containing a breakdown of the total Subcontract Price in form and detail acceptable to Contractor. In the event Contractor disapproves said breakdown, Contractor shall establish a reasonable breakdown which shall serve as the basis for partial payments. Any breakdown must be consistent with the allocation approved by Owner.

    c.    Partial payments shall be due on or about the fifth day following receipt of payment from Owner by Contractor. No partial payment made under this Subcontract shall be considered an acceptance of the Work in whole or in part. All material and Work covered by partial payments shall become the property of Contractor, or, if the Contract Documents so provide, the property of Owner; however, this provision shall not relieve Subcontractor from the sole responsibility and liability for all Work and materials upon which payments have been made until final acceptance thereof by Owner.

    d.    Subcontractor shall ensure that all sub-subcontractors (which includes employees, suppliers, laborers and materialmen of Subcontractor, and sub-subcontractors and sub-suppliers of any tier), at all times, are promptly paid all amounts due in connection with the performance of this subcontract. After the first partial payment hereunder, Contractor shall have the right to withhold any subsequent partial payments until Subcontractor submits evidence satisfactory to Contractor that all previous amounts owed in connection with performance of this Subcontract have been paid. Contractor shall have the right, but not the duty, to directly pay any sub-subcontractor or sub-supplier of any tier upon receipt of notice that such party is unpaid, and shall thereafter be entitled to deduct such payments from amounts due to the Subcontractor. Subcontractor may be required to furnish with any payment application (a) an affidavit stating that all obligations directly or indirectly related to any payment have been paid, (b) a lien waiver for Subcontractor and all sub-subcontractors and sub-suppliers of any tier in a form acceptable to Contractor, and (c) certified copies of payrolls of Subcontractor, and all sub-subcontractors and sub-suppliers of any tier. Subcontractor shall also immediately reimburse Contractor for any amounts paid by Contractor or under Contractor's payment bond, caused by failure by Subcontractor to make payment as provided in this Article.

    e.    Subcontractor expressly agrees that payment by the Owner to the Contractor for any Work performed by the Subcontractor is a condition precedent to any payment by the Contractor to the Subcontractor. If Contractor's payment is held up due to the fault of Contractor, and not due to the fault of Subcontractor, then Subcontractor will be paid on a timely basis, even if Contractor is not paid.

    f.    Final payment shall be made: (1) after Subcontractor's work has been accepted by Owner, (2) satisfactory proof of payment of all amounts owed by Subcontractor in connection with this Subcontract has been provided to Contractor, (3) consent of Subcontractor's surety, if any, has been provided, (4) the Subcontractor's Work is complete, and (5) Contractor has been paid in full for the Subcontractor's Work.

    g.    Subcontractor accepts exclusive liability for, and agrees to promptly and fully pay, any and all sales tax, use tax, value added tax, road receipts tax and other taxes, premiums, employment taxes, and contributions required of Subcontractor, any sub-subcontractors and sub-suppliers of any tier, by federal, state or local acts or regulations. Subcontractor agrees to furnish Contractor with suitable written evidence that it has fulfilled such obligations. Subcontractor shall indemnify and hold harmless Contractor and Owner with respect to the payment of any such taxes, premiums or contributions under any applicable act, law or regulation, including interest and penalties.

    h.    Contractor may withhold from any payment, including final payment, such amount as Contractor, in its discretion, deems reasonably necessary to protect itself against any actual or potential liability or damage directly or indirectly relating to the Subcontract, or for any liability or damage for which Subcontractor otherwise may be liable to Contractor.

3.    Subcontractor's Investigations and Representations

    Subcontractor represents that it is fully qualified to perform this Subcontract, and acknowledges that, prior to the execution of this Subcontract, it has (a) by its own independent investigation ascertained (i) the Work required by this Subcontract, (ii) the conditions involved in performing the Work, and (iii) the obligations of this Subcontract and the Contract Documents; (b) inspected the Project site and thoroughly examined all general or local conditions that could affect the Work and; (c) verified all information furnished by Contractor or others and has satisfied itself as to the correctness and accuracy of that information. Any failure by Subcontractor to independently investigate and become fully informed will not relieve Subcontractor from its responsibilities hereunder. Failure of Subcontractor to make a written inquiry to Contractor prior to bidding shall constitute a complete waiver and release of all Subcontractor's claims arising out of or based on any facts, conditions, risks, contingencies or ambiguities that were discovered, or should have been discovered, by the Subcontractor as a result of the investigation and inspection described herein.



..doc

4.    Subcontractor's Liability

a.    Subcontractor hereby assumes the entire responsibility and liability for all Work, supervision, labor and materials provided ...eunder, whether or not erected in place, and for all plant, scaffolding, tools, equipment, supplies and other things provided by Subcontractor until final ...eptance of the Work by Owner. In the event of any loss, damage or destruction thereof from any cause, and except to the extent that either Owner or ...ntractor provide Builders Risk insurance coverage for such loss, damage or destruction at Subcontractor's cost. In the event damage to the Work is covered by any insurance policy provided by the ...ke good said loss, damage or destruction at Subcontractor's cost. In the event damage to the Work is covered by any insurance policy provided by the ...ntractor or Owner, Subcontractor will pay the deductible amount.

b.    Subcontractor shall be liable for all costs Contractor incurs as a result of Subcontractor's failure to perform this Subcontract in ...cordance with its terms. Subcontractor's failure to perform shall include the failure of sub-subcontractors and sub-suppliers of any tier to perform. ...bcontractor's liability shall include, but not be limited to: (1) damages and other delay costs payable by Contractor to Owner or other third party; (2) ...ntractor's increased costs of performance, such as extended overhead and increased performance costs resulting from Subcontractor-caused delays or ...proper Subcontractor work; (3) warranty and rework costs; (4) liability to third parties; and (5) attorneys' fees and related costs.

c.    Indemnification

To the fullest extent permitted by applicable law, Subcontractor agrees to indemnify, hold harmless and defend Contractor, ...wner and their respective directors, officers, agents and employees from and against all claims, damages, demands, losses, expenses, causes of action, suits or ...er liabilities (including all costs and reasonable attorneys' fee), of every kind and character arising, or alleged to arise, on account of bodily injuries, personal ...uries, death suffered by any persons (whether they be third persons, Subcontractor, or employees of either of the parties hereto or any sub-subcontractor or ...b-supplier at any tier) or damage to property in any way occurring, incidental to, arising out of, or in connection with the Subcontract Work performed or to ...performed by Subcontractor or any sub-subcontractors or sub-suppliers of any tier. The Subcontractor's obligation under this paragraph does not extend to ...demnifying Contractor or Owner against Contractor or Owner's own negligence. This indemnification is in addition to any indemnification requirements ...posed on the Subcontractor as a result of the Contract Documents, which requirements are expressly incorporated herein. This indemnification shall not be ...ited as to the amount or types of damages, including, without limitation, compensation or benefits payable by or for Subcontractor or under any worker's ...mpensation acts, disability or benefit acts, or other employee benefit acts. Subcontractor expressly acknowledges that it has received from Contractor One ...undred Dollars ($100.00) and other fair, adequate and separate consideration in return for its agreement to provide indemnification as provided herein.

d.    Subcontractor shall also procure and maintain contractual liability insurance as necessary to secure the indemnification ...bligations set forth herein above. This insurance obligation shall be independent from the indemnification obligation itself.

5.    Subcontractor's Insurance

Prior to commencing the Work, Subcontractor shall procure, with Contractor and Owner as additional insured parties, and with ...cates of same provided to Contractor in advance of commencing of the Work, and thereafter maintain, at its own expense, until final acceptance of the ...ork, insurance coverage as more fully described in the Contract Documents, and in a form and from insurers acceptable to Contractor. If Contractor ...quires separate or different insurance coverages of Subcontractor than those contained in the Contract Documents, the insurance coverages required of ...bcontractor will be set forth in an attached Exhibit "A."

6.    Time of Performance

a.    Subcontractor will proceed with the Work in a prompt and diligent manner, in accordance with the Schedule set forth in ...ragraph 4 of the Subcontract Provisions, as reasonably amended from time to time. TIME IS OF THE ESSENCE. Subcontractor shall be entitled to ...dditional compensation for compliance with schedule amendments only to the extent, if any, that the Contract Documents entitle Contractor to ...imbursement and Contractor actually receives such reimbursement.

b.    If requested by Contractor, Subcontractor shall submit a detailed schedule for performance of the Subcontract, in a form ...cceptable to Contractor, which shall comply with all scheduling requirements of the Contract Documents and with Article 6.a. above. Contractor may, at its ...le discretion, direct Subcontractor to make reasonable modifications and revisions in said schedule.

c.    Subcontractor will coordinate its work with the work of Contractor, other subcontractors, and Owner's other contractors, if ...ly, so no delays or interference will occur in the completion of any part or all of the Project. In the event any other contractor or subcontractor damages the ...ork or otherwise damages Subcontractor in the performance of the Work, Subcontractor shall neither seek nor be entitled to any compensation from ...ontractor, but shall seek its damages directly from such other party.

d.    Should the Subcontractor's performance of this Subcontract be delayed, impacted or disrupted by any acts of the Contractor, ...her subcontractors, or Owner's other contractors, if any, or be delayed, impacted or disrupted by any acts or causes which are beyond the fault of and ...nforeseeable by the Subcontractor or sub-subcontractors and sub-suppliers of any tier, the Subcontractor shall receive an equitable extension of time for the ...rformance of this Subcontract to the extent an extension of time is granted to the Contractor under the Contract Documents, but shall not be entitled to any ...crease in the Subcontract Price or to damages or additional compensation as a consequence of such delays, impacts, disruptions, or acceleration resulting ...erefrom, subject only to the exception where the Owner is adjudicated to be liable and, in fact, compensates Contractor for such delays, impacts, disruptions, ...acceleration. Contractor will pay the Subcontractor the amount allowed and paid by the Owner for the Subcontractor's delay, impact, disruption or ...cceleration. Within five (5) days after the commencement of any delay, impact or disruption, or acceleration caused by Contractor, other subcontractors, or ...wner's other contractors, if any, the Subcontractor shall notify Contractor in writing stating the full details of the cause of the alleged delay, impact, ...sruption or acceleration. Failure to furnish in a timely manner such notice shall constitute a complete waiver and release of the Subcontractor's right to claim ...account of such delay, impact, disruption or acceleration. The Subcontractor shall notify Contractor of any delays, impacts, disruptions or acceleration for ...hich the Owner may be responsible within five (5) days after commencement of such delay, impacts, disruptions or acceleration, or 2/3rd of the time ...owed for the Contractor to furnish the Owner notice under the Contract Documents, whichever is less, so that any claim may be timely processed against the ...wner. Failure to furnish such notice in a timely manner shall constitute a complete waiver and release of the Subcontractor's right to claim.

7.    Changes and Claims

a.    Contractor may, at any time, unilaterally or by agreement with Subcontractor, and without notice to sureties, make changes in the Work covered by this Subcontract. Any unilateral order, or agreement, under this Article 7.a. shall be in writing. Subcontractor shall perform the Work as changed without delay.

b.    Subcontractor shall submit in writing any claims for adjustment in the price, schedule or other provisions of the Subcontract laimed by Subcontractor for changes directed by Owner, or for damages for which the Owner is liable, or as a result of deficiencies or discrepancies in the Contract Documents, to Contractor in time to allow Contractor to comply with the applicable provisions of the Contract Documents. Failure of the Subcontractor to furnish such claims on a timely basis shall constitute a complete waiver and release of the Subcontractor's right to claim. Contractor shall process said claims in the manner provided by and according to the provisions of the Contract Documents so as to protect the interests of Subcontractor and others including Contractor. Subcontract adjustments shall be made only to the extent that Contractor receives relief from or must grant relief to Owner.

c.    Subject to the express limitations set forth in paragraph 6.d., when there are changes ordered by Contractor independent of the Owner or the Contract Documents, Subcontractor shall be entitled to equitable adjustment in the Subcontract Price, if Subcontractor submits in writing to Contractor its claim within five (5) days of the beginning of the event for which claim is made.

d.    Nothing shall excuse subcontractor from prosecution of and completion of the Work while resolution of a claim, dispute or other controversy is pending.

e.    Subcontractor shall indemnify and hold Contractor harmless from any cost, expense, fine or liability (including attorney's fees) resulting from a claim or portion of a claim submitted by Subcontractor which turns out to be wrongful or groundless.

8.    Subcontractor's Failure to Perform

a.    If, in the opinion of Contractor, Subcontractor shall at any time (1) refuse or fail to provide sufficient properly skilled workmen or materials of the proper quality, (2) fail in any respect to prosecute the Work according to the Schedule, (3) cause, by any action or omission, the stoppage of, delay of, or interference with the Work of Contractor or of any other subcontractor, or other contractors employed by the Owner, if any, (4) fail to comply with all provisions of this Subcontract or the Contract Documents, (5) be adjudged a bankrupt, or make a general assignment for the benefit of its creditors, (6) have a receiver appointed, or (7) become insolvent or a debtor in reorganization proceedings, then the Contractor may at its option (i) without voiding the other provisions of the Subcontract and without notice to the sureties, take such steps as are necessary to overcome the condition, in which case the Subcontractor shall be liable to Contractor for the cost thereof, or (ii) terminate the Subcontract for default.

In the event the Contractor exercises its option under (i), this may include the furnishing of such labor, materials or supplies as is necessary in the sole opinion and discretion of the Contractor to achieve a timely completion of the Work. Since Contractor is under no obligation to terminate Subcontractor from the job, at the election of Contractor, the Subcontractor, although in default, will diligently continue to prosecute the work to completion in coordination with the Contractor's supplemental efforts, if any. Subcontractor shall be fully liable for all such costs incurred by Contractor, including a fee of ten percent (10%) of the costs of any supplemental labor, material or supplies to compensate the Contractor for having to undertake the supplemental construction activities.

In the event Contractor exercises its option under (ii) above, Contractor may, at its option, (1) enter on the premises and take possession, for the purpose of completing the Work, of all materials and equipment of Subcontractor, (2) require Subcontractor to assign to Contractor any or all of its subcontracts or purchase orders involving the Project, or (3) complete the Work either by itself or through others, by whatever method Contractor aay deem expedient. In case of termination for default, Subcontractor shall not be entitled to receive any further payment until the Work shall be fully completed and accepted by Owner. At such time, if the unpaid balance of the Subcontract Price to be paid shall exceed the expense incurred by Contractor in completing the Work, including an overhead fee of ten percent (10%) of the costs of completing the Work, such excess shall be paid by Contractor to Subcontractor. If the unpaid balance of the Subcontract Price shall be less than the expenses incurred by Contractor in completing the Work, including an overhead fee of ten percent (10%) of the cost of completing the Work, then Subcontractor shall pay Contractor the difference within five (5) business days following demand by Contractor. Subcontractor shall pay all reasonable costs of collection, if any.

b.    If Contractor wrongfully terminates Subcontractor under Article 8, the termination shall be deemed to be a termination for convenience, as provided in Article 13.

9.    Resolution of Disputes

a.    In case of any dispute between Contractor and Subcontractor, due to any action or omission of Owner, its agents, employees, or Owner's other contractors or involving the Contract Documents, Subcontractor agrees to be bound to the same extent that Contractor is bound to Owner by the terms of the Contract Documents, and by any and all preliminary and final decisions or determinations made thereunder by the party, board or court so authorized in the Contract Documents or by law, whether or not Subcontractor is a party to such proceedings. In case of such dispute, Subcontractor will comply with all provisions of the Contract Documents allowing a reasonable time for Contractor to analyze and forward to Owner any required communications or documentation. Failure to strictly comply with the provisions of the Contract Documents or this Subcontract shall constitute a complete waiver and release of the Subcontractor's right to claim. Contractor will, at its option (1) present to Owner, in Contractor's name, or (2) authorize Subcontractor to present to Owner, in Contractor's name, all of Subcontractor's claims and answer Owner's claims involving Subcontractor's Work, whenever Contractor is permitted to do so by the terms of the Contract Documents. If such dispute is prosecuted or defended by Contractor, Subcontractor agrees to furnish all documents, statements, witnesses, and other information required, and to pay or reimburse Contractor for all costs, including attorneys' fees, incurred in connection therewith. The Subcontract Price shall be adjusted by Subcontractor's allocable share determined in accordance with Article 7 hereof.

b.    With respect to any controversy between Contractor and Subcontractor not involving Owner or the Contract Documents, Contractor shall issue a decision which shall be followed by Subcontractor in executing the remaining Work. If the Subcontractor is correct as to the controversy, Subcontractor shall be entitled to an equitable adjustment in the Subcontract Price as its sole remedy. Notification of any such claim for equitable adjustment must be asserted in writing within ten (10) days of Subcontractor's knowledge of the claim. Failure to strictly comply with this notice provision shall constitute a complete waiver and release of the Subcontractor's right to claim.

c.    Anything to the contrary in the Contract Documents notwithstanding, any controversy between Contractor and Subcontractor not involving Owner or the Contract Documents and which is not amicably resolved by the Parties will be submitted to a court of competent jurisdiction in the state where the Project is located. In no event will any such controversy be submitted to arbitration, except at the sole option of Contractor. In the event the Contractor, in its sole discretion, elects to arbitrate, then the Contractor may join any other subcontractor or third party in any arbitration proceeding.

10.    Warranty

Subcontractor warrants its Work hereunder to Contractor on the same terms, and for the same period, as Contractor warrants the work to Owner under the Contract Documents; and with respect to Subcontractor's Work, Subcontractor shall perform all warranty obligations and responsibilities

assumed by Contractor under the Contract Documents. If no warranty period is stipulated in the Contract Documents, then Subcontractor warrants for a period of one (1) year from the date of final acceptance by Owner of all Work under the Subcontract, that all such Work will be (1) free from defects in workmanship or materials, (2) merchantable, (3) fit for its intended purpose, and (4) in conformance with all applicable specifications, drawings, samples, symbols and other Contract Documents.

11.  Liens

a.  If in the Prime Contract, Purchaser has been required to waive and release its right to file a mechanics lien against the Project, then this shall be a "no lien" Purchase Order, whereby Supplier expressly waives, releases and discharges for itself and for sub-subcontractors and sub-suppliers of any tier, any and all rights to file any lien, attachment, or claim of any kind against the Project on account of materials, services, supplies or labor furnished for the Project. Supplier in such case shall similarly include such "no lien" provision in any and all sub-subcontracts and purchase orders that it enters into.

b.  In the event that liens are filed by anyone in relation to the labor or material being furnished by Subcontractor, Subcontractor agrees to protect, indemnify and hold harmless Contractor and Owner therefrom, and to have the same discharged or removed, by posting a bond with the appropriate authorities, or otherwise, at Subcontractor's own cost and expense (including attorneys' fees) within five (5) days after notice to do so by Contractor. In the event such lien is not so discharged, such circumstance shall be deemed a failure to perform the Work on the part of the Subcontractor, subject to the conditions and terms set forth in Article 8 above.

c.  Subcontractor shall, as often as required by Contractor, furnish a sworn statement showing all sub-subcontractors and sub-suppliers who furnish labor or material to Subcontractor, with their names and addresses and the amount due or to become due to each. Like statements may be required from such sub-subcontractors and sub-suppliers of any tier.

d.  Without prejudice to the provisions of paragraph 11.a., and prior to final payment, Subcontractor shall provide to Contractor a release of its liens and claims and all liens and claims of all persons furnishing labor or materials for the performance of this Subcontract in a form acceptable to Contractor, along with satisfactory evidence that there are no other liens or claims whatsoever outstanding against the Work.

e.  If required by Contractor, Subcontractor shall furnish releases of liens with respect to all prior payments, as part of each request for partial payment other than the initial request.

12.  Inspection and Acceptance

Subcontractor shall provide appropriate facilities at all reasonable times for inspection by Contractor or Owner of the Work and materials provided under this Subcontract, whether at the Project site or at any place where such Work or materials may be in preparation, manufacture, storage, or installation. Subcontractor shall promptly replace or correct any Work or materials which Contractor or Owner shall reject as failing to conform to the requirements of this Subcontract. The Work shall be accepted according to the terms of the Contract Documents. However, unless otherwise agreed in writing, entrance and use by Owner or Contractor shall not constitute acceptance of the Work.

13.  Termination for Convenience

Contractor shall have the right to terminate this Subcontract, in whole or part, for convenience by providing Subcontractor with a written notice of termination, to be effective upon receipt by Subcontractor. If the Subcontract is terminated for convenience, the Subcontractor shall be paid the amount representing costs which are due from the Owner for its Work, as provided in the Contract Documents, after payment therefor by Owner to Contractor. In no event will Contractor be liable to Subcontractor for any loss of anticipated profits or other consequential damages. The Subcontractor's remedy under this Article 13, shall be exclusive. Nothing herein shall bar withholdings by Contractor permitted by other provisions of the Subcontract.

14.  Approvals

a.  Subcontractor shall deliver to Contractor copies of shop drawings, cuts, samples and material lists required by Contractor or the Contract Documents and in accordance with the Contract Documents within sufficient time so as not to delay performance of the Project or within sufficient time for Contractor to submit the same within the time stated in the Contract Documents, whichever is earlier. Any deviation from the Contract Documents shall be clearly identified on shop drawings.

b.  Contractor's review of shop drawings, cuts, samples and material lists is only for the convenience of the Owner in following the Work and shall not relieve the Subcontractor of its obligation to perform the Work in strict accordance with the Contract Documents, or the proper matching and fitting of the Work with contiguous work. Should the proper and accurate performance of the Work depend upon the proper and accurate performance of other work not included in this Subcontract, Subcontractor shall use all necessary means to discover defects in such other work, and shall report the said defects in writing to Contractor before proceeding with the Work, and shall allow the Contractor a reasonable time to remedy such defects.

c.  Subcontractor warrants and agrees that it can and will obtain all requisite approvals from Owner as to its eligibility to serve as a subcontractor and the approvals of all materials and performance of the Work as required by the Contract Documents.

15.  Clean-Up

Subcontractor shall clean up its Work and remove all debris resulting from its Work in a manner that will not impede either the progress of the Project or of other trades. If Subcontractor fails to comply with this Article within 24 hours after receipt of notice of noncompliance from Contractor, Contractor may perform such necessary clean-up and deduct the cost from any amounts due to Subcontractor.

16.  Assignment

Subcontractor shall not sub-subcontract its Work under this Subcontract and shall not assign or transfer this Subcontract, or funds due hereunder, without the prior written consent of Contractor and Subcontractor's surety. Contractor shall not unreasonably withhold its consent to the assignment of funds due hereunder.

17.  Patents and Royalties

Except as otherwise provided by the Contract Documents, Subcontractor shall pay all royalties and license fees which may be due on the inclusion of any patented materials in the Work. Subcontractor shall defend all suits or claims for infringement of any patent rights that may be brought against Contractor or Owner arising out of the Work, and shall be liable to Contractor and Owner for all loss, including all costs and expenses, on account thereof.

18.  Licenses and Permits

Subcontractor shall obtain and pay for all permits, licenses, fees and certificates of inspection necessary for the prosecution and completion of its Work, and shall arrange for all necessary inspections and approvals by public officials.

19.  Laws, Regulations and Ordinances

Subcontractor agrees to be bound by, and, at its own cost, comply with all Federal, state and local laws, ordinances and regulations applicable to this Subcontract and the performance of the Work hereunder including the Occupational Safety and Health Act of 1970. Subcontractor shall be duly licensed to do business under the law of the applicable jurisdictions. Subcontractor shall be liable to Contractor and Owner for all loss, cost and expense attributable to any acts of commission or omission by Subcontractor or its sub-subcontractors or sub-suppliers of any tier resulting from failure to comply including, but not limited to, any fines, penalties or corrective measures.

20.  Labor

a.  Neither Subcontractor nor its sub-subcontractors or sub-suppliers of any tier shall employ anyone at the Project whose employment is objected to by Contractor or Owner.

b.  Should any workers performing work covered by this Subcontract engage in a strike or other work stoppage or cease to work due to picketing or a labor dispute of any kind, said circumstances shall be deemed a failure to perform the Work on the part of the Subcontractor subject to the conditions and terms set forth in Article 8 above.

21.  Equal Opportunity

a.  In connection with the performance of Work under this Subcontract, Subcontractor agrees not to discriminate against any employee or applicant for employment because of race, creed, color, sex, age, religion, national origin, sexual orientation, marital status, handicap, disability, citizenship status or veteran status. The aforesaid provision shall include, but not be limited to, the following: employment, upgrading, demotion or transfer; recruitment or advertising; layoff or termination; rates of pay or other forms of compensation; and selection for training, including apprenticeship. Subcontractor agrees to post hereafter, in conspicuous places, available for employees and applicants for employment, notices, prepared by Subcontractor, and approved by the government when required, setting forth the provision of this Article 21.

b.  Subcontractor shall permit access to its books, records, and accounts by representatives of Contractor or Owner for purposes of investigation to ascertain compliance with the provisions of this Article 21.

c.  In the event of Subcontractor's non-compliance with the equal opportunity provisions of this Subcontract, this Subcontract may be terminated for default.

d.  Subcontractor shall include the provisions of this Article 21 in every Subcontract or purchase order of any tier. The requirements of this Article 21 shall be in addition to any equal opportunity provisions contained in the Contract Documents.

22.  Notices

All notices shall be addressed to the Contractor and Subcontractor at the addresses set out above, and shall be considered as delivered when postmarked, if dispatched by registered mail, or when received in all other cases.

23.  Safety

Subcontractor agrees that the prevention of accidents to workers engaged in the Work is the sole responsibility of the Subcontractor. Subcontractor agrees to comply with laws, regulations and codes concerning safety as shall be applicable to the Work and to the safety standards established for the Work by the Contract Documents. When so ordered, the Subcontractor agrees to stop any part of the Work which the Contractor deems unsafe until corrective measures satisfactory to the Contractor have been taken, and further agrees to make no claim for damages growing out of such Work stoppages. Should the Subcontractor neglect to adopt such corrective measures, Contractor may perform them and deduct the cost from payments due or to become due to Subcontractor. Failure on the part of Contractor to stop unsafe practices shall in no way relieve Subcontractor of its responsibility under this Article.

24.  Severability and Waiver

The partial or complete invalidity of any one or more provisions of this Subcontract shall not affect the validity or continuing force and effect of any other provision. The failure of either party to insist, in any one or more instances, upon the performance of any of the terms, covenants, or conditions of this Subcontract, or to exercise any right herein, shall not be construed as a waiver or relinquishment of such term, covenant, condition or right as respects further performance.

25.  Governing Law

This Subcontract shall be governed by and construed in accordance with the laws of the state in which the Project is located.

26.  Advertising

Neither Subcontractor or its sub-subcontractors or sub-suppliers of any tier, shall take photographs of the Work on site, or publish or display advertising matter of any description relating to the Project without first obtaining the written consent of Contractor and Owner.

27.  ~~Bond~~ Delete

Within ten (10) days after request by the Contractor, the Subcontractor shall furnish at Contractor's expense a Performance and Payment Bond in the full amount of this Subcontract. The bond form and the surety shall be acceptable to the Contractor.

28.    <u>Execution</u>

This Subcontract is signed and received by a legal representative of the Subcontractor authorized to bind Subcontractor to all terms of this Subcontract. Should this Subcontract, because of the manner of execution, not be legally binding upon the Subcontractor for any reason whatsoever, all Work under this Subcontract shall be performed at the risk of the Subcontractor, and, should this Subcontract be voided due to improper execution, Subcontractor agrees to waive all claims for compensation for Work performed.

29.    <u>Owner Approval</u>

If the Owner has the right to approve Subcontractor, this Subcontract shall not be effective until the Owner's approval is appropriately indicated. Any Work undertaken by Subcontractor pending the Owner's action shall be for Subcontractor's account if Owner does not give its approval.

30.    <u>Complete Agreement</u>

This Subcontract contains the entire agreement between the Contractor and Subcontractor with respect to the matters covered herein. No other agreements, representations, warranties, or other matters, oral or written, shall be deemed to bind the parties hereto.

**IN WITNESS WHEREOF**, the parties, by their duly authorized representatives, have hereunto executed this Subcontract, on the day and year above written.

Execute and return duplicate copy to Cives Steel Company, New England Division, P.O. Box 1077, Augusta, Me 04332-1077.

CIVES STEEL COMPANY
Contractor

Witness, Donna M. Rollins

By:
Name:    David W. Gugan
Title:    Project Manager

BOSTON STEEL ERECTORS
Subcontractor

Witness

By: _Bernard Marlin_
Name: _Bernard MacInnes_
Title: _President_

## Other Documents
1:04-cv-10369-NG Blacksmith Investments, LLC v. Cives Steel Co., Inc.

### United States District Court

### District of Massachusetts

Notice of Electronic Filing

The following transaction was received from Barra, Joseph entered on 8/13/2004 at 12:02 PM EDT and
filed on 8/13/2004

**Case Name:**       Blacksmith Investments, LLC v. Cives Steel Co., Inc.
**Case Number:**     1:04-cv-10369
**Filer:**
**Document Number:** 7

**Docket Text:**
AFFIDAVIT in Support re [5] MOTION to Dismiss *Complaint (Oral Argument Requested) of Martin C.
Keniston.* (Barra, Joseph)

The following document(s) are associated with this transaction:

**Document description:**Main Document
**Original filename:**yes
**Electronic document Stamp:**
[STAMP dcecfStamp_ID=1029851931 [Date=8/13/2004] [FileNumber=633922-0]
[ca1073b18f3e58bfeccba69fd18c7ac5c5b82b8ac0c7804d9ebf8c539a80c08ee51e
5a711d93853fd34d4afb95e958bbc4f19024cf476426c4a4608abe13b2d8]]

**1:04-cv-10369 Notice will be electronically mailed to:**

Joseph A. Barra    jbarra@ghlaw.com, jboomer@ghlaw.com

**1:04-cv-10369 Notice will not be electronically mailed to:**

Guy E. Guarino
72 Country Club Way
Ipswich, MA 01938

Original to Paul Lawless,
Citizens Bank of Massachusetts,
February 4, 2002

## DEMAND REVOLVING DISCRETIONARY LINE OF CREDIT NOTE

CITIZENS BANK OF
MASSACHUSETTS
28 State Street
Boston, Massachusetts 02109

Loan No. _____          January 29, 2002

BORROWER:    Boston Steel Erectors, Inc.
Boston Steel Erectors Holdings Trust
185 Squire Road
Revere, MA 02151

Boston Steel & Precast Erectors, Inc.
Boston Steel & Precast Erectors
Holdings Trust
910R Broadway
Route 1 North
Saugus, MA 01906

PRINCIPAL AMOUNT:    $1,200,000.00

For value received, the undersigned Massachusetts corporations each with a principal place of business at 185 Squire Road, Revere, MA 02151 (collectively, the "Borrower") promise to pay to the order of CITIZENS BANK OF MASSACHUSETTS, a Massachusetts bank (the "Bank") at the office of the Bank located at 28 State Street, Boston, Massachusetts 02109, or such other place as the holder hereof shall designate, ON DEMAND, ONE MILLION, TWO HUNDRED THOUSAND AND 00/100 ($1,200,000.00) DOLLARS or, if less, the aggregate unpaid principal amount of all loans made by the Bank to the Borrower pursuant to this Note, with interest then accrued at the Interest Rate herein specified. The Borrower further promises to make payments of interest only on the unpaid principal balance, monthly in arrears commencing one month from the date hereof and thereafter on the same day of each calendar month at a fluctuating per annum interest rate equal to (i) the Bank's Prime Rate in effect from time to time, or at Borrower's option (ii) the LIBOR Rate in effect for periods of thirty (30), sixty (60), ninety (90), one hundred twenty (120) or one hundred eighty (180) days (the "Interest Period") plus Two Hundred Twenty-Five (225) Basis Points per annum (in each case a "LIBOR Rate Loan") as more fully described below and in the Appendix No. 1 attached hereto, the terms and conditions of which shall be incorporated by reference herein), or (iii) the LIBOR Advantage Rate (in each case a "LIBOR Advantage Loan") as more fully described in the Appendix No. 2 attached hereto. Interest shall be computed on the basis of a three hundred sixty (360) day year and actual days elapsed.

The Bank's "Prime Rate" shall mean the variable per annum rate of interest so designated from time to time by the Bank as its Prime Rate. The Prime Rate is a reference rate and does not necessarily represent the lowest or best rate being charged to any borrower.

BOST1-750942-2



BSM00024

The term "LIBOR Rate" means relative to any Interest Period for LIBOR Rate Loans, the offered rate for deposits of U.S. Dollars in an amount approximately equal to the amount of the requested LIBOR Rate Loan for a term coextensive with the designated Interest Period which the British Bankers' Association fixes as its LIBOR rate and which appears on the Telerate Page 3750 as of 11:00 a.m. London time on the day which is two London Banking Days prior to the beginning of such Interest Period.

Borrower must provide Bank with advance written notice (the "LIBOR Loan Request" as further defined in the Borrowing Procedures section of Appendix No. 1) of its election regarding a LIBOR Rate Loan.

Borrower may prepay a LIBOR Rate Loan subject to the LIBOR Rate Loan Prepayment Fee as set forth in the Repayments, Prepayments, and Interest section of Appendix No. 1 attached hereto. If Bank elects to declare the Note to be immediately due and payable, then any prepayment fee with respect to a LIBOR Rate Loan shall become due and payable in the same manner as through Borrower had exercised the right of prepayment as set forth therein. There shall be no prepayment fee if prepayment occurs at such time as the Interest Rate in effect hereunder is based upon the Bank's Prime Rate or the LIBOR Advantage Rate.

This Note is a revolving facility: principal amounts repaid hereunder shall be available to be redrawn hereunder until demand.

This Note incorporates the terms and conditions set forth in a certain Revolving Loan and Security Agreement of even date (the "Loan Agreement") which terms and conditions are incorporated by reference herein, including without limitation Borrower's warranties, covenants and negative covenants contained therein.

Advances hereunder shall be made in accordance with the terms and conditions of the Loan Agreement.

Any deposits or other sums at any time credited by or due from the holder to the Borrower, and any securities or other property of the Borrower at any time in the possession of the holder may at all times be held and treated as collateral for the payment of this Note and any and all other liabilities (direct or indirect, absolute or contingent, sole, joint or several, secured or unsecured, due or to become due, now existing or hereafter arising) of the Borrower to the holder. Regardless of the adequacy of collateral, the holder may apply or set off such deposits or other sums against such liabilities at any time after demand has been made.

The Borrower hereby waives presentment, demand, notice, protest and all other demands and notices in connection with the delivery, acceptance, performance, or enforcement hereof except as otherwise provided in the Loan Agreement and consent that no indulgence, and no substitution, release or surrender of collateral, and no discharge or release of any other party primarily or secondarily liable hereon, shall discharge or otherwise affect the liability of the Borrower. No delay or omission on the part of the holder in exercising any right hereunder shall operate as a waiver of such right or of any other right hereunder, and a waiver of any such right on any one occasion shall

2

BSM00025

not be construed as a bar to or waiver of any such right on any future occasion.

Borrower hereby agrees to maintain its operating account with the Bank during the term of this Note, or any extensions thereof.

This Note is secured by any collateral at any time granted to Bank to secure any obligations of any maker hereof.

The Borrower agrees to pay on demand all reasonable costs and expenses (including legal costs and attorney's fees) incurred or paid by the holder in enforcing this Note on demand.

This Note shall take effect as a sealed instrument and shall be governed by the laws of the Commonwealth of Massachusetts.

WITNESS:

_____
James B. Zuckernik

WITNESS:

_____

_____

WITNESS:

_____

_____

WITNESS:

_____

_____

Boston Steel Erectors, Inc.

By: _____
Its:  President and Treasurer

Boston Steel & Precast Erectors, Inc.

By: _____
Its:   President and Treasurer

Boston Steel Erectors Holdings Trust

By: _____
Its:   Trustee

Boston Steel & Precast Erectors Holdings Trust

By: _____
Its:   Trustee

3

BSM00026

**APPENDIX NO. 1 TO $1,200,000 DEMAND
NOTE TO BOSTON STEEL ERECTORS, INC. and
BOSTON STEEL AND PRECAST ERECTORS, INC.**
Dated January 29, 2002

**Certain Definitions.**

"Applicable Margin" means Two Hundred Twenty-Five (225) Basis Points per annum.

"Business Day" means:

(a) any day which is neither a Saturday or Sunday nor a legal holiday on which commercial banks are authorized or required to be closed;

(b) when such term is used to describe a day on which a borrowing, payment, prepaying, or repaying is to be made in respect of any LIBOR Rate Loan, any day which is: (i) neither a Saturday or Sunday nor a legal holiday on which commercial banks are authorized or required to be closed in New York City; and (ii) a London Banking Day; and

(c) when such term is used to describe a day on which an interest rate determination is to be made in respect of any LIBOR Rate Loan, any day which is a London Banking Day.

"Interest Period" means relative to any LIBOR Rate Loan:

(a) initially, the period beginning on (and including) the date on which such LIBOR Rate Loan is made or continued as, or converted into, a LIBOR Rate Loan and ending on (but excluding) the day which numerically corresponds to such date one, two, three, four or six months thereafter (or, if such month has no numerically corresponding day, on the last Business Day of such month), in each case as the Borrower may select in its LIBOR Loan Request and

(b) thereafter, each period commencing on the last day of the next preceding Interest Period applicable to such LIBOR Rate Loan and ending one, two, three, four or six months thereafter, as selected by the Borrower by irrevocable notice to the Bank not less than two Business Days prior to the last day of the then current Interest Period with respect thereto; provided, however, that:

    (a)    the Borrower shall not be permitted to select Interest Periods to be in effect at any one time which have expiration dates occurring on more than one different date;

    (b)    Interest Periods commencing on the same date for LIBOR Rate Loans comprising part of the same advance under this agreement shall be of the same duration;

    (c)    Interest Periods for LIBOR Rate Loans in connection with which Borrower has or may incur Hedging Obligations with the Bank shall be of the same duration as the relevant periods set under the applicable Hedging Contracts;

    (d)    if such Interest Period would otherwise end on a day which is not a Business Day, such Interest Period shall end on the next following Business Day unless such day

Citizens/Boston Steel

falls in the next calendar month, in which case such Interest Period shall end on the first preceding Business Day; and

(e)     no Interest Period may end later than the termination of this agreement.

"Interest Payment Date" means relative to any LIBOR Rate Loan, the last Business Day of such Interest Period.

"LIBOR Rate Loan" means any loan or advance the rate of interest applicable to which is based upon the LIBOR Rate.

"LIBOR Lending Rate" means, relative to any LIBOR Rate Loan to be made, continued or maintained as, or converted into, a LIBOR Rate Loan for any Interest Period, a rate per annum determined pursuant to the following formula:

$$\text{LIBOR Lending Rate} = \frac{\text{LIBOR Rate}}{(1.00 - \text{LIBOR Reserve Percentage})}$$

"LIBOR Reserve Percentage" means, relative to any day of any Interest Period for LIBOR Rate Loans, the maximum aggregate (without duplication) of the rates (expressed as a decimal fraction) of reserve requirements (including all basic, emergency, supplemental, marginal and other reserves and taking into account any transitional adjustments or other scheduled changes in reserve requirements) under any regulations of the Board of Governors of the Federal Reserve System (the "Board") or other governmental authority having jurisdiction with respect thereto as issued from time to time and then applicable to assets or liabilities consisting of "Eurocurrency Liabilities", as currently defined in Regulation D of the Board, having a term approximately equal or comparable to such Interest Period.

"London Banking Day" means a day on which dealings in US dollar deposits are transacted in the London interbank market.

"Hedging Contracts" means, interest rate swap agreements, interest rate cap agreements and interest rate collar agreements, or any other agreements or arrangements entered into between the Borrower and the Bank and designed to protect the Borrower against fluctuations in interest rates or currency exchange rates.

"Hedging Obligations" means, with respect to the Borrower, all liabilities of the Borrower to the Bank under Hedging Contracts.

**Borrowing Procedures.**

LIBOR Loan Request. By delivering a borrowing request to the Bank on or before 10:00 a.m., New York time, on a Business Day, the Borrower may from time to time irrevocably request, on not less than two nor more than five Business Days' notice, that a LIBOR Rate Loan be made in a minimum amount of Fifty Thousand ($50,000.00) Dollar increments with an Interest Period of 30, 60, 90, 120 or 180 days. On the terms and subject to the conditions of this agreement, each LIBOR Rate Loan shall be made available to the Borrower no later than 11:00 a.m. New York

BOST1-750942

BSM00028

Citizens/Boston Steel

time on the first day of the applicable Interest Period by deposit to the account of the Borrower as shall have been specified in its borrowing request.

Continuation and Conversion Elections.  By delivering a continuation/conversion notice to the Bank on or before 10:00 a.m., New York time, on a Business Day, the Borrower may from time to time irrevocably elect, on not less than two nor more than five Business Days' notice, that all, or any portion of any LIBOR Rate Loan be converted on the last day of an Interest Period into a LIBOR Rate Loan with a different Interest Period, or continued on the last day of an Interest Period as a LIBOR Rate Loan with a similar Interest Period, provided, however, that no portion of the outstanding principal amount of any LIBOR Rate Loans may be converted to, or continued as, LIBOR Rate Loans when demand or an Event has occurred and is continuing, and no portion of the outstanding principal amount of any LIBOR Rate Loans may be converted to, LIBOR Rate Loans of a different duration if such LIBOR Rate Loans relate to any Hedging Obligations.  In the absence of delivery of a continuation/conversion notice with respect to any LIBOR Rate Loan at least two Business Days before the last day of the then current Interest Period with respect thereto, such LIBOR Rate Loan shall, on such last day, automatically convert to a loan that accrues interest by reference to the Prime Rate.

**Repayments, Prepayments, and Interest.**

Repayments Continuations and Conversions.  LIBOR Rate Loans shall mature and become payable in full on the last day of the Interest Period relating to such LIBOR Rate Loan.  Upon maturity, a LIBOR Rate Loan may be continued for an additional Interest Period or may be converted to a Prime Rate Loan.

Voluntary Prepayment of LIBOR Rate Loans.  LIBOR Rate Loans maybe prepaid upon the terms and conditions set forth herein.  For LIBOR Rate Loans in connection with which the Borrower has or may incur Hedging Obligations, additional obligations may be associated with prepayment, in accordance with the terms and conditions of the applicable Hedging Contracts. The Borrower shall give the Bank, no later than 10:00 a.m., New York City time, at least four (4) Business Days notice of any proposed prepayment of any LIBOR Rate Loans, specifying the proposed date of payment of such LIBOR Rate Loans, and the principal amount to be paid.  Each partial prepayment of the principal amount of LIBOR Rate Loans shall be accompanied by the payment of all charges outstanding on such LIBOR Rate Loans and of all accrued interest on the principal repaid to the date of payment.  Borrower acknowledges that prepayment or acceleration of a LIBOR Rate Loan during an Interest Period shall result in the Bank incurring additional costs, expenses and/or liabilities and that it is extremely difficult and impractical to ascertain the extent of such costs, expenses and/or liabilities.  Therefore, all full or partial prepayments of LIBOR Rate Loans shall be accompanied by, and the Borrower hereby promises to pay, on each date a LIBOR Rate Loan is proposed or the date all sums payable hereunder become due and payable, by acceleration or otherwise, in addition to all other sums then owing, an amount ("LIBOR Rate Loan Prepayment Fee") determined by the Bank pursuant to the following formula:

BOST1-750942

BSM00029

Citizens/Boston Steel

(a) the then current rate for United States Treasury securities (bills on a discounted basis shall be converted to a bond equivalent) with a maturity date closest to the end of the Interest Period as to which prepayment is made, subtracted from

(b) the LIBOR Lending Rate plus the Applicable Margin applicable to the LIBOR Rate Loan being prepaid.

If the result of this calculation is zero or a negative number, then there shall be no LIBOR Rate Loan Prepayment Fee. If the result of this calculation is a positive number, then the resulting percentage shall be multiplied by:

(c) the amount of the LIBOR Rate Loan being prepaid.

The resulting amount shall be divided by:

(d) 360

and multiplied by:

(e) the number of days remaining in the Interest Period as to which the prepayment is being made.

Said amount shall be reduced to present value calculated by using the referenced United States Treasury securities rate and the number of days remaining on the Interest Period for the LIBOR Rate Loan being prepaid.

The resulting amount of these calculations shall be the LIBOR Rate Loan Prepayment Fee.

Interest Provisions. Interest on the outstanding principal amount of each LIBOR Rate Loan shall accrue during the Interest Period applicable thereto at a rate equal to the sum of the LIBOR Lending Rate for such Interest Period plus the Applicable Margin thereto and be payable on each Interest Payment Date.

## Miscellaneous LIBOR Rate Loan Terms.

LIBOR Rate Lending Unlawful. If the Bank shall determine (which determination shall, upon notice thereof to the Borrower be conclusive and binding on the Borrower) that the introduction of or any change in or in the interpretation of any law, rule, regulation or guideline, (whether or not having the force of law) makes it unlawful, or any central bank or other governmental authority asserts that it is unlawful, for the Bank to make, continue or maintain any LIBOR Rate Loan as, or to convert any loan into, a LIBOR Rate Loan of a certain duration, the obligations of the Bank to make, continue, maintain or convert into any such LIBOR Rate Loans shall, upon such determination, forthwith be suspended until the Bank shall notify the Borrower that the circumstances causing such suspension no longer exist, and all LIBOR Rate Loans of such type

BOST1-750942

BSM00030

Citizens/Boston Steel

shall automatically convert into Prime Rate Loans at the end of the then current Interest Periods with respect thereto or sooner, if required by such law or assertion.

Substitute Rate. If the Bank shall have determined that

(a)      US dollar deposits in the relevant amount and for the relevant Interest Period are not available to the Bank in the London interbank market;

(b)      by reason of circumstances affecting the Bank in the London interbank, adequate means do not exist for ascertaining the LIBOR Rate applicable hereunder to LIBOR Rate Loans of any duration, or

(c) LIBOR no longer adequately reflects the Bank's cost of funding loans.

then, upon notice from the Bank to the Borrower, the obligations of the Bank under the Revolving Note and the Loan Agreement to make or continue any loans as, or to convert any loans into LIBOR Rate Loans of such duration shall forthwith be suspended until the Bank shall notify the Borrower that the circumstances causing such suspension no longer exist.

Indemnities. In addition to the LIBOR Rate Loan Prepayment Fee, the Borrower agrees to reimburse the Bank (without duplication) for any increase in the cost to the Bank, or reduction in the amount of any sum receivable by the Bank, in respect, or as a result of:

(a) any conversion or repayment or prepayment of the principal amount of any LIBOR Rate Loans on a date other than the scheduled last day of the Interest Period applicable thereto;

(b) any loans not being made as LIBOR Rate Loans in accordance with the borrowing request thereof;

(c) any LIBOR Rate Loans not being continued as, or converted into, LIBOR Rate Loans in accordance with the continuation/conversion notice thereof, or

(d) any costs associated with marking to market any Hedging Obligations that (in the reasonable determination of the Bank) are required to be terminated as a result of any conversion, repayment or prepayment of the principal amount of any LIBOR Rate Loan on a date other than the scheduled last day of the Interest Period applicable thereto;

The Bank shall promptly notify the Borrower in writing of the occurrence of any such event, such notice to state, in reasonable detail, the reasons therefor and the additional amount required fully to compensate the Bank for such increased cost or reduced amount. Such additional amounts shall be payable by the Borrower to the Bank within five days of its receipt of such notice, and such notice shall, in the absence of manifest error, be conclusive and binding on the Borrower. The Borrower understands, agrees and acknowledges the following: (i) the Bank does not have any obligation to purchase, sell and/or match funds in connection with the use of LIBOR Rate as a basis for calculating the rate of interest on a LIBOR Rate Loan, (ii) the LIBOR Rate may be

BOST1-750942

8

BSM00031

Citizens/Boston Steel

used merely as a reference in determining such rate, and (iii) the Borrower has accepted the LIBOR Rate as a reasonable and fair basis for calculating such rate, the LIBOR Rate Prepayment Fee, and other funding losses incurred by the Bank. Borrower further agrees to pay the LIBOR Rate Prepayment Fee and other funding losses, if any, whether or not the Bank elects to purchase, sell and/or match funds.

Increased Costs. If on or after the date hereof the adoption of any applicable law, rule or regulation or guideline (whether or not having the force of law), or any change therein, or any change in the interpretation or administration thereof by any governmental authority, central bank or comparable agency charged with the interpretation or administration thereof, or compliance by the Bank with any request or directive (whether or not having the force of law) of any such authority, central bank or comparable agency:

(a) shall subject the Bank to any tax, duty or other charge with respect to its LIBOR Rate Loans or its obligation to make LIBOR Rate Loans, or shall change the basis of taxation of payments to the Bank of the principal of or interest on its LIBOR Rate Loans or any other amounts due under this agreement in respect of its LIBOR Rate Loans or its obligation to make LIBOR Rate Loans (except for the introduction of, or change in the rate of, tax on the overall net income of the Bank or franchise taxes, imposed by the jurisdiction (or any political subdivision or taxing authority thereof) under the laws of which the Bank is organized or in which the Bank's principal executive office is located); or

(b) shall impose, modify or deem applicable any reserve, special deposit or similar requirement (including, without limitation, any such requirement imposed by the Board of Governors of the Federal Reserve System of the United States) against assets of, deposits with or for the account of, or credit extended by, the Bank or shall impose on the Bank or on the London interbank market any other condition affecting its LIBOR Rate Loans or its obligation to make LIBOR Rate Loans;

and the result of any of the foregoing is to increase the cost to the Bank of making or maintaining any LIBOR Rate Loan, or to reduce the amount of any sum received or receivable by the Bank under this Agreement with respect thereto, by an amount deemed by the Bank to be material, then, within 15 days after demand by the Bank, the Borrower shall pay to the Bank such additional amount or amounts as will compensate the Bank for such increased cost or reduction.

Increased Capital Costs. If any change in, or the introduction, adoption, effectiveness, interpretation, reinterpretation or phase-in of, any law or regulation, directive, guideline, decision or request (whether or not having the force of law) of any court, central bank, regulator or other governmental authority affects or would affect the amount of capital required or expected to be maintained by the Bank, or person controlling the Bank, and the Bank determines (in its sole and absolute discretion) that the rate of return on its or such controlling person's capital as a consequence of its commitments or the loans made by the Bank is reduced to a level below that which the Bank or such controlling person could have achieved but for the occurrence of any such circumstance, then, in any such case upon notice from time to time by the Bank to the

BOST1-750942

9                                    BSM00032

Citizens/Boston Steel

Borrower, the Borrower shall immediately pay directly to the Bank additional amounts sufficient to compensate the Bank or such controlling person for such reduction in rate of return. A statement of the Bank as to any such additional amount or amounts (including calculations thereof in reasonable detail) shall, in the absence of manifest error, be conclusive and binding on the Borrower. In determining such amount, the Bank may use any method of averaging and attribution that it (in its sole and absolute discretion) shall deem applicable.

Taxes. All payments by the Borrower of principal of, and interest on, the LIBOR Rate Loans and all other amounts payable hereunder shall be made free and clear of and without deduction for any present or future income, excise, stamp or franchise taxes and other taxes, fees, duties, withholdings or other charges of any nature whatsoever imposed by any taxing authority, but excluding franchise taxes and taxes imposed on or measured by the Bank's net income or receipts (such non-excluded items being called "Taxes"). In the event that any withholding or deduction from any payment to be made by the Borrower hereunder is required in respect of any Taxes pursuant to any applicable law, rule or regulation, then the Borrower will

(a)     pay directly to the relevant authority the full amount required to be so withheld or deducted;

(b)     promptly forward to the Bank an official receipt or other documentation satisfactory to the Bank evidencing such payment to such authority; and

(c)     pay to the Bank such additional amount or amounts as is necessary to ensure that the net amount actually received by the Bank will equal the full amount the Bank would have received had no such withholding or deduction been required.

Moreover, if any Taxes are directly asserted against the Bank with respect to any payment received by the Bank hereunder, the Bank may pay such Taxes and the Borrower will promptly pay such additional amount (including any penalties, interest or expenses) as is necessary in order that the net amount received by the Bank after the payment of such Taxes (including any Taxes on such additional amount) shall equal the amount the Bank would have received had not such Taxes been asserted.

If the Borrower fails to pay any Taxes when due to the appropriate taxing authority or fails to remit to the Bank the required receipts or other required documentary evidence, the Borrower shall indemnify the Bank for any incremental Taxes, interest or penalties that may become payable by the Bank as a result of any such failure.

BOST1-750942

BSM00033

Citizens/Boston Steel

**APPENDIX NO. 2 TO $1,200,000 TERM NOTE**
**TO BOSTON STEEL ERECTORS, INC.**
**BOSTON STEEL & PRECAST ERECTORS, INC.**
**BOSTON STEEL ERECTORS HOLDINGS TRUST AND**
**BOSTON STEEL & PRECAST ERECTORS HOLDINGS TRUST**
Dated January 29, 2002

## CERTAIN DEFINITIONS

"Applicable Margin" means Two hundred twenty-five (225) basis points per annum.

"Business Day" means any day, which is neither a Saturday, nor Sunday, nor a legal holiday, on which commercial banks are authorized or required, to be closed in Boston.

"Interest Period" means initially, the period commencing as of the date of this agreement (the "Start Date") and ending on the numerically corresponding date one month later, and thereafter each one-month period ending on the day of such month that numerically corresponds to the Start Date. If an Interest Period is to end in a month for which there is no day which numerically corresponds to the Start Date, the Interest Period will end on the last day of such month.

"Interest Payment Date" means initially, the 29ᵗ day of January 2002, and thereafter the numerically corresponding date of each month. If a month does not contain a day that numerically corresponds to the date of the Interest Payment Date, the Interest Payment Day shall be last day of such month.

"LIBOR Rate" means relative to any Interest Period, the offered rate for delivery of deposits of U.S. Dollars which the British Bankers' Association fixes as its LIBOR rate and which appears on the Telerate Page 3750 as of 11:00 a.m. London time on the day on which the Interest Period commences, and for a period approximately equal to such Interest Period. If the first day of any Interest Period is not a day which is both a (i) Business Day, and (ii) a day on which US dollar deposits are transacted in the London Interbank market (a "London Banking Day"), the LIBOR Rate shall be determined in reference to the next preceding day which is both a Business Day and a London Banking Day. If for any reason the LIBOR Rate is unavailable and/or the Bank is unable to determine the LIBOR Rate for any Interest Period, the LIBOR Rate shall be deemed to be equal to the Bank's Prime rate.

## INTEREST

Interest Provisions. Interest on the outstanding principal amount of the Loan shall accrue during the Interest Period applicable thereto at a rate equal to the sum of the LIBOR Rate for such Interest Period **plus** the Applicable Margin thereto (the "LIBOR Advantage Rate") and be payable on each Interest Payment Date.

BOST1-750942

BSM00034

*Original to Paul Lawics.*
*Citizens Bank*
*2/13/02*

# LOAN AND SECURITY AGREEMENT

## DATED AS OF JANUARY 29 , 2002

by and between

Citizens Bank of Massachusetts

and

Boston Steel Erectors, Inc.
Boston Steel & Precast Erectors, Inc.
Boston Steel Erectors Holdings Trust
Boston Steel & Precast Erectors Holdings Trust

```
┌─────────────────────┐
│      EXHIBIT         │
│  Bracero      8      │
│   5-4-07             │
└─────────────────────┘
```

BSM00036

## LOAN AND SECURITY AGREEMENT

LOAN AND SECURITY AGREEMENT (as it may be amended and supplemented from time to time, the "Agreement"), dated as of January 29, 2002, by and between Boston Steel Erectors, Inc., Boston Steel & Precast Erectors, Inc., Boston Steel Erectors Holdings Trust and Boston Steel & Precast Erectors Holdings Trust, each a Massachusetts trust or corporation, as the case may be, with its principal place of business at 185 Squire Road, Suite 9, Revere, MA 02151 (collectively, the "Borrower"), and Citizens Bank of Massachusetts, with its principal office at 28 State Street, Boston, MA 02109 ("Lender").

Lender has agreed, subject to the terms and conditions of this Agreement, and in reliance upon the representations and warranties set forth herein, to establish for Borrower's benefit the Revolving Loan set forth below. All schedules and exhibits referred to in this Agreement are annexed hereto and made a part hereof.

In consideration of the foregoing and in further consideration of the mutual covenants herein contained, the parties hereto agree as follows:

## SECTION 1.  DEFINITIONS

1.1    General Terms. As used in this Agreement, the following terms shall have the following respective meanings:

"Account" means an account, as that term is defined, from time to time, in Article 9 of the UCC, of Borrower and, in any event, shall include, without limitation, any right of Borrower to payment of a monetary obligation, whether or not earned by performance and whether or not evidenced by an Instrument, for (a) property that has been or is to be sold, leased, licensed, assigned, or otherwise disposed of, (b) services rendered or to be rendered, (c) a policy of insurance issued or to be issued, or (d) a secondary obligation incurred or to be incurred, including without limitation, all Health Care Insurance Receivables.

"Account Debtor" shall mean any Person who is or who may become obligated to Borrower under, with respect to or on account of an Account, Chattel Paper or a General Intangible.

"Accounts Receivable" means (a) all Accounts, (b) all notes, drafts and acceptances of Borrower, (c) all rights of Borrower to receive the payment of money under Contracts, franchises, licenses, permits and other agreements, Documents or Instruments (whether or not earned by performance) or otherwise, and (d) all rights of Borrower to receive payments from any other source, together, in each case, with all rights and interests of Borrower in the goods and services, if any, which have given rise

BSM00037

thereto, including, without limitation, returned or repossessed goods and unpaid sellers' rights of rescission, replevin and reclamation and rights to stoppage in transit.

"Advance" shall mean any advance of funds to or at the direction of Borrower pursuant to the terms of this Agreement.

"Article Nine" means Article Nine of the UCC.

"Banking Day" means a day other than a Saturday, Sunday or banking holiday in the Commonwealth of Massachusetts.

"Borrower" shall have the meaning given to that term in the preamble of this Agreement.

"Borrower's Account" means Borrower's main operating account maintained with Lender bearing Borrower's name and in which all advances by Lender to Borrower and all payments by Borrower to Lender pursuant to this Agreement shall be recorded.

"Capital Expenditures" means, during the period being measured, the total amount of Borrower's expenditures for the acquisition, construction, improvement, replacement or purchase of property or plant assets or any other assets that in accordance with GAAP is required or permitted to be treated as a capital asset, including, expenditures under capital leases.

"Chattel Paper" means any and all rights, title and interests of Borrower in, to and under chattel paper, as that term is defined, from time to time, in Article 9 of the UCC.

"Closing Date" means the date hereof.

"Code" means the Internal Revenue Code of 1986, as amended, and all rules and regulations promulgated thereunder, in each case as in effect from time to time.

"Collateral" means any and all assets of Borrower or any of Borrower's Affiliates or any other Person with respect to which Lender is now or hereafter granted a lien, security interest, mortgage or any other interest pursuant to this Agreement or any other agreement entered into with respect to the transactions contemplated by this Agreement, including the items described in Section 3.1 hereof.

"Contracts" means any and all rights, title and interests of Borrower in, to and under contracts, undertakings, franchise agreements, warranties and representations, records and books of account and other agreements (other than rights evidenced by Chattel Paper, Documents or Instruments, as those terms are defined above and below),

BSM00038

including, without limitation, with respect to an Account and any agreement relating to the terms of payment or the terms of performance.

"Demand" means demand by Lender for payment under the Revolving Note.

"Deposit Account" means a deposit account, as that term is defined, from time to time, in Article 9 of the UCC, of Borrower, and, in any event, shall include, without limitation, any demand, time, savings, passbook, or similar account, including without limitation, certificates of deposit, maintained by Borrower with any Person.

"Document" means any and all rights, title and interests of Borrower in, to and under a document, as that term is defined, from time to time, in Article 9 of the UCC, and, in any event, shall include all files, records, ledger sheets and documents covering or relating to any of the Collateral.

"ERISA" means the Employee Retirement Income Security Act of 1974, as amended, and any successor statute of similar import, and all regulations and rulings promulgated thereunder, in each case as in effect from time to time.

"ERISA Affiliate" means each trade or business (whether or not incorporated) that together with Borrower or any of Borrower's Affiliates would be treated as a single employer under Section 414 of the Code for any purpose or would be treated as a single employer under Section 4001 of ERISA.

"Equipment" means equipment, as that term is defined, from time to time, in Article 9 of the UCC, of Borrower, in all of its forms, and, in any event, shall include, without limitation, all machinery, furniture and furnishings, Fixtures, and fixed assets and other goods (including without limitation, computer programs embedded in such goods and any supporting information provided in connection with a transaction relating to the program) used or consumed by Borrower in a business and all tangible personal property similar to any of the foregoing of every kind and description, together with all improvements, attachments, components, accessions or appurtenances thereto and all Contracts, contract rights and Chattel Paper arising out of any lease of any of the foregoing.

"Fixtures" means fixtures, as that term is defined, from time to time, in Article 9 of the UCC, of Borrower, and, in any event, shall include, without limitation, goods of Borrower that become so related to particular real property that an interest in them arises under any real estate law applicable thereto.

"GAAP" means generally accepted accounting principles in effect from time to time in the United States of America, consistently applied.

BSM00039

"General Intangible" means a general intangible, as that term is defined, from time to time, in Article 9 of the UCC, of Borrower of every kind and nature, and, in any event, shall include all choses in action and causes of action and all other intangible property, including without limitation, Payment Intangibles, corporate or other business records, indemnification claims, contract rights (including rights under leases, whether entered into as lessor or lessee, interest rate protection agreements and other agreements), Intellectual Property, goodwill, customer lists, rights to distributions in respect of interests in partnerships, joint ventures and other business associations, licenses, permits, registrations, franchises, tax refund claims, claims in or under insurance policies (including unearned premiums), compensation (in any form whatsoever) resulting from any requisition, confiscation, eminent domain, condemnation, seizure or forfeiture by any Governmental Authority or other Person (including any Person acting under color of a Governmental Authority).

"Guarantors" shall mean Robert Saraceno and Bernard MacInnis, Jr.

"Health Care Insurance Receivable" means a health care insurance receivable, as that term is defined, from time to time, in Article 9 of the UCC, owing to Borrower and, in any event, shall include, without limitation, an interest of Borrower in or claim by Borrower under a policy of insurance which is a right to payment of a monetary obligation for health care goods or services provided.

"Indebtedness" means all items of borrowed money, guarantees and capital lease obligations.

"Indemnified Person" means each of Lender and Lender's Affiliates, successors and assigns and each of their respective past, present and future stockholders, officers, directors, employees, agents, attorneys and representatives, and their respective heirs, executors, legal representatives, successors and assigns.

"Instruments" means any and all rights, titles and interests of Borrower in, to and under instruments, as that term is defined, from time to time, in Article 9 of the UCC.

"Intellectual Property" means all intellectual and similar property of Borrower of every kind and nature, now or hereafter owned by Borrower or as to which Borrower now or hereafter acquires rights pursuant to a License or otherwise, including without limitation, inventions, designs, Patents, Trademarks, copyrights subject to the laws of the United States or any other country (whether as author, assignee, transferee or otherwise and including all registrations and applications therefor), Licenses, trade secrets, confidential or proprietary technical and business information, know-how, show-how or other data or information, software and databases and all embodiments or fixations thereof and related documentation, registrations and franchises, and all additions, improvements and accessions to, and books and records describing or used in connection with, any of the foregoing.

"Interest Expense" means for the period measured the total interest expense paid or payable during such period.

"Inventory" means all inventory, as that term is defined, from time to time, in Article 9 of the UCC, of Borrower in all of its forms, and, in any event, shall include, without limitation, all goods, merchandise, raw materials, parts, components, assemblies, goods or work in process, finished goods and any other tangible personal property, including, in each case without limitation, computer programs embedded in such goods and any supporting information provided in connection with a transaction relating to the program, which: (a) are leased by Borrower as lessor, (b) are held by Borrower for sale or lease or to be furnished under a contract of service, (c) are furnished by Borrower under a contract of service, or (d) are used or consumed by Borrower in a business, together with all such inventory that has been returned to or repossessed by or on behalf of Borrower.

"Investment Property" means all investment property, as that term is defined, from time to time, in Article 9 of the UCC, of Borrower.

"Laws" means all ordinances, statutes, rules, regulations, guidelines, orders, injunctions, writs or decrees of any governmental or political subdivision or agency thereof, or any court or similar entity established by any such governmental or political subdivision or agency thereof

"Legal Rate" means, at any time, the maximum rate of interest which may be charged on any Loan under applicable Law.

"Lender" shall have the meaning given to that term in the preamble of this Agreement.

"Letter-of-Credit" means a letter-of-credit right, as that term is defined, from time to time, in Article 9 of the UCC, of Borrower, and, in any event, shall include, without limitation, a right of Borrower to payment or performance under a letter of credit, whether or not the beneficiary has demanded or is at the time entitled to demand payment or performance.

"Licenses" means any license or sublicense to which Borrower is a party (whether as licensor, licensee, sublicensor or sublicensee) which relates to any Patent, Trademark or other Intellectual Property and all rights of Borrower thereunder.

"Loan" shall mean the Revolving Loan.

"Multiemployer Plan" means a Plan defined as such in Section 3(37) of ERISA to which Borrower or any ERISA Affiliate has or had any obligation to contribute or has made contributions.

"Obligations" means all loans, advances, debts, liabilities, obligations, Indebtedness, covenants and duties owing by Borrower to Lender of every kind and description (whether or not evidenced by any note or other instrument and whether or not for the payment of money), direct or indirect, primary or secondary, absolute or contingent, fixed or otherwise (including obligations of performance) due or to become due, now existing or hereafter arising, including without limitation all principal, interest, charges, expenses, attorneys' fees and other sums chargeable to Borrower by Lender pursuant to this Agreement, the Revolving Note or any Related Agreements and all reimbursement obligations under letters of credit, and the performance and fulfillment by Borrower of all of the tens, conditions, promises, covenants and provisions contained in this Agreement, the Revolving Note, or any Related Agreement.

"PBGC" means the Pension Benefit Guaranty Corporation established under Title IV of ERISA or any other governmental agency, department or instrumentality succeeding to the functions of said corporation.

"Patents" means all of the following now or hereafter owned by Borrower or as to which Borrower now or hereafter acquires rights pursuant to a License or otherwise: (a) all letters patent of the United States or any other country, all registrations and recordings thereof, and all applications for letters patent of the United States or any other country, including registrations, recordings and pending applications in the United States Patent and Trademark Office or any similar offices in any other country, and (b) all reissues, continuations, divisions, continuations-in-part, renewals or extensions thereof, and the inventions disclosed or claimed therein, including the right to make, use and/or sell the inventions disclosed or claimed therein.

"Payment Intangible" means a payment intangible, as that term is defined, from time to time, in Article 9 of the UCC, and, in any event, shall include, without limitation, a general intangible under which the Account Debtor's principal obligation is a monetary obligation.

"Permitted Encumbrances" means (A) liens incurred or deposits made in the ordinary course of Borrower's business in connection with worker's compensation, unemployment insurance and other types of social security, or to secure Borrower's performance of leases, utility contracts, franchises, licenses, statutory obligations, surety and appeal bonds, performance and return-of-money bonds and other similar obligations (exclusive of obligations for the payment of borrowed money) incurred in the ordinary course of Borrower's business; (B) liens permitted pursuant to the provisions of Section 7.1; and (C) inchoate liens which have not ripened into liens otherwise not permitted hereunder.

"Person" means a corporation, association, general or limited partnership, limited liability company, limited liability partnership, organization, business, joint venture, individual, sole proprietorship, government or political subdivision thereof or a governmental agency.

"Plan" means any employee pension or benefit plan (A) to which Section 4021 of ERISA applies to Borrower or any ERISA Affiliate; or (B) to which Borrower or any ERISA Affiliate made, or was required to make, contributions at any time within the five (5) years preceding the Closing Date.

"Pledged Account" means the deposit account pledged to Lender as described in Section 3.6.

"Prime Rate" means the prime rate of interest announced by Lender at its principal office in Boston from time to time as its "Prime Rate". Notwithstanding the foregoing, Borrower acknowledges that Lender may regularly make domestic commercial loans at rates of interest less than the rate of interest referred to in the immediately preceding sentence.

"Proceeds" means all proceeds, as that term is defined, from time to time, in Article 9 of the UCC, and, in any event, shall include, without limitation: (a) whatever is acquired (whether in the form of money, an Account Receivable, a Deposit Account, an Instrument or otherwise) upon the sale, exchange, license, lease or other disposition of any Collateral, (b) whatever is collected on, or distributed on account of, any Collateral, (c) rights arising out of any Collateral, (d) insurance payable by reason of the loss, destruction, theft, conversion or nonconformity of, defects or infringement of rights in, or damage, destruction, theft or other conversion of whatever nature to, any Collateral (whether or not Lender is the loss payee thereof), (e) claims arising out of the loss, nonconformity, or interference with the use of, defects or infringement of rights in, or damage to, any Collateral, (f) whatever is collected in connection with any requisition, confiscation, eminent domain, condemnation, seizure or forfeiture of any Collateral by any Governmental Authority or other Person (including any Person acting under color of a Governmental Authority), and (g) any and all other amounts from time to time paid or payable under or in connection with any of the Collateral.

"Prohibited Transaction" means with respect to any Plan or Multiemployer Plan any transaction described in Section 406 of ERISA which is not exempt by reason of Section 408 of ERISA and any transaction described in Section 4975 of the Code which is not exempt by reason of Section 4975(c)(2) or 4975(d) of the Code.

"Related Agreements" means those documents described on the Index of Closing Documents attached hereto as Schedule 1.1 (b).

"Reportable Event" means (A) a reportable event described in Section 4043 of ERISA; (B) a withdrawal by a substantial employer from any Plan that has two or more contributing sponsors at least two of which are not under common control, as referred to in Section 4063('b) of ERISA; or (C) a cessation of operations at a facility causing more than twenty percent (20%) of any Plan's participants to be separated from employment, as referred to in Section 4068(f) of ERISA.

"Revolving Loan" shall have the meaning given to that term in Section 2.1.

"Revolving Note" shall have the meaning given to that term in Section 2.1, which term shall include any amendment, extension, renewal or modification thereto.

"Senior Management" shall mean Robert Saraceno and Bernard MacInnis, Jr.

"Solvent" means, as to any Person, that such Person (A) has capital sufficient to carry on its business and transactions and all business and transactions in which it is about to engage, (B) is able to pay its debts as they mature, (C) owns property having both a fair salable value in the ordinary course of such Person's business and a fair valuation that is greater than the amount required to pay its Indebtedness (D) has not been dissolved, terminated or ceased normal business operations, a receiver has not been appointed in connection with such Person and no proceedings under bankruptcy, insolvency or other similar laws have been commenced by or against such Person.

"Subsidiary" means, with respect to any Person, any corporation or other entity of which capital stock or other ownership interests having ordinary voting power to elect a majority of the board of directors or other Persons performing similar functions is at the time in question directly or indirectly owned or controlled by such Person.

"Supporting Obligation" means all supporting obligations, as that term is defined, from time to time, in Article 9 of the UCC, and, in any event, shall include, without limitation: a Letter of Credit Right or secondary obligation that supports the payment or performance of an Account Receivable, Chattel Paper, a Document, a General Intangible, an Instrument or Investment Property.

"Trademarks" means all of the following now or hereafter owned by Borrower or as to which Borrower now or hereafter acquires rights pursuant to a License or otherwise: (a) all trademarks, service marks, trade names, corporate names, company names, business names, fictitious business names, trade styles, trade dress, logos, other source or business identifiers, designs and general intangibles of like nature, now existing or hereafter adopted or acquired, all registrations and recordings thereof, and all registration and recording applications filed in connection therewith, including registrations and registration applications in the United States Patent and Trademark Office, any State of the United States or any similar offices in any other country or any political subdivision thereof, and all extensions or renewals thereof, (b) all goodwill associated therewith or symbolized thereby, and (c) all other assets, rights and interests that uniquely reflect or embody such goodwill.

"Unfunded Vested Liabilities" means, with respect to any Plan, the amount (if any) by which the present value of all vested benefits under the Plan exceeds the fair

market value of all Plan assets allocable to such benefits, as determined on the most recent valuation date of the Plan and in accordance with the provisions of ERISA for calculating the potential liability of Borrower or any ERISA Affiliate to the PBGC or the Plan under Title IV of ERISA.

"UCC" means the Uniform Commercial Code as in effect from time to time in the State of Connecticut, including without limitation, the Uniform Commercial Code as amended by Revised Article 9, provided that if by reason of mandatory provisions of law, the creation and/or perfection or the effect of perfection or non-perfection of the security interests in any Collateral is governed by the Uniform Commercial Code as in effect in a jurisdiction other than Connecticut, the term "UCC" shall also mean the Uniform Commercial Code as in effect from time to time in such other jurisdiction (including without limitation, the Uniform Commercial Code as amended by Revised Article 9) for purposes of the provisions hereof relating to such creation, perfection or effect of perfection or non-perfection.

1.2    Accounting Terms.    Subject to the provisions of Section 9.4, all accounting terms not specifically defined herein shall be construed in accordance with GAAP consistent with those applied in the preparation of the financial statements required hereunder and in connection with the financial covenants set forth herein.

1.3    UCC Terms.    Any term used in the UCC and not defined in this Agreement shall have the meaning given that term in the UCC.

## SECTION 2.  THE LOAN TRANSACTIONS

Lender shall make the Loans to Borrower upon the following terms and conditions:

2.1    Revolving Loans.    Subject to the terms and conditions set forth in this Agreement **and at Lender's sole and absolute discretion,** Lender may from time to time extend a Revolving Loan to Borrower by making one or more Advances to Borrower up to but not exceeding in the aggregate One Million Two Hundred Thousand Dollars ($1,200,000.00).  Both the timing and the amount of each Advance requested by Borrower shall be subject to Lender's sole and absolute discretion as provided for herein, which shall not be modified, restricted or limited in any way by any other provision of this Agreement or any other document executed in connection herewith.

INITIAL HERE _____  _____  _____  _____
                (BSE)       (BSPE)      (BSEHT)     (BSPEHT)

Borrower's obligation to repay Advances and to pay interest, fees, costs and expenses in connection therewith, shall be evidenced by Borrower's Demand Revolving Discretionary Line of Credit Note of even date (the "Revolving Note").

2.1.1  <u>Advances under the Revolving Loan</u>.

Within the foregoing limit, Borrower may borrow, repay and reborrow Advances at any time or from time to time from the Closing Date until Lender makes Demand, pursuant to the procedures, terms and conditions set forth in the Revolving Note.

2.1.2  <u>Repayment Required under the Revolving Loan</u>.

If at any time the aggregate outstanding balance of the Advances exceeds One Million Two Hundred Thousand Dollars ($1,200,000.00), the Borrower shall immediately repay the Advances in an amount equal to such excess.

2.1.3  <u>Manner, Time and Application of Scheduled Payments of the Revolving Loan</u>.

(A)   All scheduled payments made by Borrower hereunder on account of principal, interest, fees, costs and expenses shall be made to Lender on their respective due dates in immediately available funds not later than 11:00 a.m., Boston, Massachusetts, at Lender's address set forth herein or such other address as Lender may from time to time specify in writing.  Each payment by Borrower with respect to the Revolving Loan will be applied, first, on account of fees, costs and expenses that are due and payable by Borrower hereunder, second, on account of any interest on the Revolving Loan then due and owing, <u>third</u>, to the principal balance of the Revolving Loan outstanding.

(B)   Borrower hereby authorizes Lender to charge, from time to time, against Borrower's Account or any of Borrower's other accounts with Lender any amount so due.

2.1.5  <u>Use of Loan Proceeds under the Revolving Loan</u>.  Borrower shall use the proceeds of Advances under the Revolving Note only for Borrower's bonding and general business needs.

2.2   <u>Unused Line Fee</u>.  Borrower shall pay semi-annually, commencing six (6) months from the date hereof, an unused line fee in the amount of three-tenths of one percent (0.3%) per annum of the difference between $1,200,000 and the average daily principal amount outstanding under the Revolving Note during the payment period.

## SECTION 3.  SECURITY INTERESTS

3.1   <u>Grant of Security Interest by Borrower</u>.  To secure Borrower's timely payment and performance of all of the Obligations, Borrower hereby mortgages, pledges, transfers, conveys and delivers to Lender, and grants to Lender an irrevocable, unconditional and continuing first and prior security interest in and lien upon all assets of

Borrower, whether or not within the scope of Article Nine, including without limitation the following (the "Collateral"):

     (A)    Accounts Receivable

     (B)    Chattel Paper

     (C)    Contracts

     (D)    Deposits

     (E)    Documents

     (F)    Equipment

     (G)    Fixtures

     (H)    General Intangibles

     (I)    Instruments

     (J)    Inventory

     (K)    Investment Property

     (L)    Letter-of-Credit Rights

     (M)    Supporting Obligations

     (N)    Health Care Insurance Receivables

     (O)    Money

     (P)    All other collateral in which Borrower may hereafter grant to Lender a security interest; and

     (Q)    All renewals, substitutions, replacements, additions, accessions, proceeds (including rental payments), and products of any and all of the foregoing.

     3.2    <u>Continuous and Unconditional Security Interest</u>. Borrower and Lender expressly acknowledge that the security interest granted hereunder shall remain as security for payment and performance of the Obligations, whether now existing or which may hereafter be incurred by future advances, or otherwise. The notice of the continuing grant of this security interest therefore shall not be required to be stated on the face of any document representing any such Obligations, nor otherwise identify it as being secured

hereby. All rights of Lender hereunder, the security interest granted herein and the obligations of Borrower hereunder shall be absolute and unconditional regardless of any lack of validity of this Agreement, the Notes or any agreement or document relating thereto, any amendment, change in or waiver of any provision of any of the foregoing, or any other circumstance that might otherwise constitute a defense available to, discharge of Borrower in respect of the Obligations or this Agreement.

3.3    Priority of the Liens and Security Interests. The liens and security interests granted to Lender pursuant to Section 3.1 shall constitute valid and enforceable first priority liens and security interests against the Collateral, prior in right to all other liens, security interests, charges and other encumbrances. Except as otherwise provided herein, Borrower shall not take any action to impair or defeat the foregoing priority.

3.4    Financing Statements. Until such time as this Agreement is terminated and all obligations have been fully and finally paid in cash, Borrower hereby authorizes Lender to execute and/or file financing or continuation statements as required under the UCC or filings with the United States Patent and Trademark Office or United States Copyright Office (or any successor office or any similar office in any other country), in each case without Borrower's signature thereon, for the purpose of perfecting, confirming, continuing, enforcing, or protecting Lender's security interest granted hereunder. Borrower agrees that a carbon, photographic, photostatic or other reproduction of this Agreement or of a financing statement is sufficient as a financing statement.

3.5    Cross-Collateralization. All Collateral which Lender may at any time acquire from Borrower or from any other source in connection with any of the Obligations shall constitute collateral for each and every Obligation, without apportionment or designation as to particular Obligations, and all Obligations, however and whenever incurred, shall be secured by all Collateral, however and whenever acquired, and Lender shall have the right, in its sole discretion, to determine the order in which Lender's rights in, or remedies against, any Collateral are to be exercised, and which type or which portions of Collateral are to be proceeded against and the order of application of Proceeds of Collateral as against particular Obligations.

3.6    Pledge of Deposit Account. So long as any Borrower has a right to obtain an Advance hereunder or any Obligations remain outstanding, any payments made to Boston Steel & Precast Erectors, Inc. as described in two letter agreements of even date by and among, inter alia, the Borrowers and the Guarantors shall be made directly into interest-bearing account at Lender in the name of Robert Saraceno (the "Pledge Account," which term shall include any replacement or substitute account), provided, so long as the balance in the Pledged Account exceeds the maximum principal amount under the Revolving Note such payments need not be made into the Pledged Account. The Pledged Account shall be pledged to Lender to secure Borrower's Obligations hereunder and Robert Saraceno's obligations to Lender. Borrower shall provide Lender promptly upon its execution with a copy of any agreement pursuant to which such payments are made.

SECTION 4.   CONDITIONS PRECEDENT TO THE LOANS

4.1    **Intentionally Deleted**

SECTION 5.   REPRESENTATIONS AND WARRANTIES

To induce Lender to enter into this Agreement and to make the Loans, Borrower represents and warrants to Lender as follows:

5.1    Corporate Existence, Good Standing, Etc.  Borrower is and will continue to be a trust or corporation duly organized, validly existing and in good standing under the Laws of the Commonwealth of Massachusetts.  Borrower is and will continue to be duly qualified and licensed to transact business in all states or jurisdictions except those jurisdictions in which Borrower's failure to so qualify or be so licensed or in good standing would not, individually or in the aggregate, have a material adverse effect on Borrower's business, operations, affairs, condition, properties or prospects.

5.2    Licenses, Waivers, Material Contracts, Etc.  Borrower possesses all material licenses, waivers, consents, rights, permits, orders and other governmental authorizations and approvals, and all material franchises, contracts and agreements, necessary to carry on its business as presently conducted.  All of such licenses, waivers, consents, rights, permits, orders, authorizations, approvals, franchises, contracts and agreements are in full force and effect and there is no violation or failure of compliance or allegation of such violation or failure of compliance on the part of Borrower with respect to any of the foregoing.

5.3    Books and Records.  Borrower's principal place of business is located at Borrower's address set forth in Section 10.8; all of Borrower's books and records are kept at such principal and only place of business; and Borrower does not invoice receivables from or maintain records relating to receivables at any location other than such principal place of business.  Borrower has not changed its name, been the surviving corporation in any merger, acquired any business, or changed its chief executive office within five (5) years prior to the date of this Agreement.

5.4    Power and Authority.  Borrower has the corporate power to execute, deliver and carry out this Agreement, the Revolving Note and the Related Agreements to which it is a party and to incur the Obligations, and has taken all necessary corporate action to authorize its execution, delivery and performance of this Agreement, the Revolving Note and the Related Agreements to which it is a party and its incurring of the Obligations.

5.5    No Violation.  Borrower's execution and delivery of this Agreement, the Revolving Note and the Related Agreements to which it is a party and compliance by Borrower with all of the terms and provisions hereof and thereof, will not violate any provision of any existing Law or any writ, order, judgment, injunction, determination, or order of any court or governmental instrumentality or of Borrower's certificate

of incorporation or bylaws or any agreement or instrument to which Borrower is a party or which is binding upon Borrower or its assets, and will not result in, or require, the creation or imposition of any lien, security interest, charge or encumbrance of any nature whatsoever upon or in any of Borrower's assets except as contemplated by this Agreement, and no consent or approval of any other party (including Borrower's shareholders) and no consent, license, approval or authorization of, exemption of or registration or declaration with, any governmental bureau or agency (federal, state, municipal or otherwise) or any other Person is required in connection with the execution, delivery, performance, validity and enforceability of this Agreement, the Revolving Note and the Related Agreements.

5.6     <u>Valid and Binding Agreement</u>.  This Agreement, the Revolving Note and the Related Agreements delivered pursuant hereto will be valid and binding upon and enforceable against Borrower in accordance with their respective terms.

5.7     <u>Litigation; Claims</u>.  Except as set forth <u>in Schedule 5.7</u>, there is not pending, nor to Borrower's knowledge is there threatened, against Borrower any action, suit, order, notice, claim, investigation or proceeding at law or in equity or by or before any governmental instrumentality or other agency which could materially adversely affect Borrower or any of Borrower's properties or rights, or which could have a material adverse effect upon Borrower's business operations or financial condition, or which could involve in the aggregate the payment by Borrower of $100,000 or more or singularly the payment by Borrower of $50,000 or more (whether or not covered by insurance) if adversely determined.

5.8     <u>Existing Defaults</u>.  Except as set forth <u>on Schedule 5.8</u>, Borrower is not in default with respect to the payment or performance of any of its material obligations or in the performance of any material covenants or material conditions to be performed by Borrower pursuant to the terms and provisions of any agreement or instrument to which Borrower is a party or by which it or its property may be bound, which default has not been waived in writing, including any leases of premises on which the Collateral is or may be located, and Borrower has received no notice of default thereunder.

5.9     <u>Title to Properties</u>.  Borrower has good and marketable title to all of its properties, real and personal and such properties are subject only to the Permitted Encumbrances.  Borrower has not filed or consented to or authorized the filing of (a) any financing statement or analogous document under the UCC or any other applicable laws covering any collateral, or (b) any assignment in which Borrower assigns any collateral or any security agreement or similar instrument covering any Collateral with any foreign governmental, municipal or other office, which financing statement or analogous document, assignment, security agreement or similar instrument is still in effect, except in each case Permitted Encumbrances.

5.10     <u>Compliance With Laws</u>.  Borrower is in compliance with, and has not received any notice that it is not in compliance with, all applicable Laws with respect to:

(A)   Any restrictions, specifications or other requirements pertaining to products which it sells or leases or to the services it performs;

(B)   The conduct of its business operations; and

(C)   The use, maintenance and operation of the property leased or owned by it in the operation of its business.

5.11   Guaranties, Etc.   There are no outstanding contracts or agreements of guaranty or suretyship made by Borrower or to which Borrower is a party or to which Borrower or any of its assets are subject, except the Related Agreements and as set forth in Schedule 5.1 1.

5.12   Financial Statements.   Except as previously disclosed to Lender, Borrower's financial statements heretofore furnished to Lender, including any schedules and notes pertaining thereto, have been prepared on a review basis, and fully and fairly present Borrower's financial condition at the dates thereof and the results of Borrower's operations for the periods covered thereby, and there has been no material adverse change in Borrower's financial condition or business from the date of the financial information most recently provided to Lender, to the date of this Agreement.   All projections furnished to Lender by Borrower have been prepared in good faith and represent the best opinion of Borrower as of the Closing Date as to the most probable course of Borrower's business.   Such projections were prepared in accordance with practices usually followed in the preparation of accounting projections in good faith and the regular course of an ongoing business.

5.13   Existing Indebtedness.   Borrower has no material Indebtedness of any nature, except as permitted by this Agreement and Borrower does not know of, or have reasonable grounds to know of, any basis for the assertion against it of any material Indebtedness of any nature.

5.14   Tax Returns.   Except as set forth in Schedule 5.14, Borrower has filed or caused to be filed and will continue to file or cause to be filed all tax returns required to be filed and has paid and will continue to pay all federal, state and local taxes shown to be due and payable on said returns and all assessments made against it and has made or caused to be made adequate provision for the payment of such taxes, assessments or other charges accruing but not yet payable, and no claims for any of such taxes are being asserted with respect to such taxes.   Except as set forth in Schedule 5.14, Borrower's federal tax returns have not been audited, or if audited have been accepted by the Internal Revenue Service as filed or amended.

5.15   Compliance With the Code and ERISA.   Borrower is in compliance in all material respects with all applicable provisions of the Code and ERISA with respect to all Plans.   Neither a Reportable Event nor a Prohibited Transaction has occurred with respect to any Plan; no notice of intent to terminate a Plan has been filed with any Person nor has

Section 4042 of ERISA entitling the PBGC to institute proceedings to terminate, or appoint a trustee to administer, a Plan, nor has the PBGC instituted any such proceedings; and neither Borrower nor any ERISA Affiliate has incurred any liability to the PBGC or the U.S. Department of Labor under ERISA. Neither the PBGC nor the U.S. Department of Labor has imposed a lien on the assets of Borrower or any ERISA Affiliate.

    5.16   _Environmental Matters._  To the best of its knowledge, Borrower:

        (A)   has obtained all permits, licenses and other authorizations which are required under all environmental Laws, including Laws relating to emissions, discharges, releases or threatened releases of pollutants, contamination, chemicals, or industrial, toxic or hazardous substances or waste into the environment (including air, surface water, ground water or land), or otherwise relating to the manufacture, processing, distribution, use, treatment, storage, disposal, transport or handling of pollutants, contaminants, chemicals, or industrial, toxic or hazardous substance or wastes;

        (B)   is in material compliance with all terms and conditions of all such required permits, licenses and authorizations, and also is in compliance with all other limitations, restrictions, conditions, standards, prohibitions, requirements, obligations, schedules and timetables contained in such Laws or contained in any Law, plan, order, decree, judgment, injunction, notice or demand letter issued, entered, promulgated or approved thereunder;

        (C)   has never caused any oil, friable asbestos, hazardous waste, hazardous material or other waste or material regulated or limited by applicable federal, state or local environmental Law ("Hazardous Material") to be spilled, placed, located or disposed of on, under or about, nor are any Hazardous Materials now existing on, under or about, any premises owned or leased by it (collectively, the "Premises") or into the atmosphere, any body of water or any wetlands in excess of the maximum permitted regulatory levels;

        (D)   has no knowledge of any notice of any violation, or lien or any other notice issued by any governmental agency or other Person with respect to the environmental condition of the Premises.

        (E)   Borrower has not received any notice from any Person with respect to any of the matters described in this Section 5.16.

    5.17   _Solvency._  After giving effect to the consummation of each transaction contemplated by this Agreement and after the Term Loan and Revolving Loan, Borrower will be Solvent.

    5.18   _No Untrue Statements, Etc._  No representation or warranty by Borrower contained in this Agreement and no statement contained in any certificate or other

connection with the transactions contemplated hereby, contains, or at the time of delivery will contain, any untrue statement of any material fact or omits or will omit any statement of any material fact necessary to make it not misleading.

5.19    Survival.  Except to the extent the representation and warranty relates to a prior date, all of Borrower's representations and warranties set forth in this Section 5 shall survive until all Obligations are finally and indefeasibly satisfied in full.

# SECTION 6.   AFFIRMATIVE COVENANTS

Borrower covenants and agrees that so long as any of the Obligations remain outstanding and unpaid it will perform and observe each and all of the following covenants and agreements:

6.1    Additional Information.  Borrower will furnish to Lender, with reasonable promptness, such information regarding Borrower's business, affairs, operations and financial condition as Lender may reasonably request and, upon reasonable prior notice, give any representative of Lender (i) access during normal business hours to, and permit Lender to examine and copy and make extracts from, any and all books, records, accounts and documents in Borrower's possession relating to Borrower's affairs; (ii) access during normal business hours to inspect any of Borrower's properties; and (iii) access to discuss Borrower's affairs, finances and accounts with any of Borrower's officers and/or any independent certified public accountants of Borrower; provided that Lender's access to Borrower's properties and officers and employees shall be scheduled so as not to materially interfere with Borrower's business operations.  Lender may at any time make requests to Account Debtors for verification of Accounts Receivable.

6.2    Taxes.  Borrower will pay and discharge at or before the date any of the same would become delinquent, all taxes including without limitation payroll taxes, assessments, claims and charges, except where the same are being contested in good faith by appropriate proceedings, and will maintain appropriate reserves for the accrual of any of the same.

6.3    Maintenance of Corporate Existence; Properties.  Borrower will do or cause to be done all things necessary to: preserve and keep in full force and effect its corporate existence, rights, franchises, privileges and contracts, and comply, in all respects, with all Laws applicable thereto.

6.4    Reporting Requirements.  Borrower will furnish or cause to be furnished to Lender the following financial statements and other information, on a consolidated basis:

(A)    Within one hundred twenty (120) calendar days after the close of each fiscal year of Borrower (i) a reviewed financial statement of Borrower at the close of such fiscal year setting forth, without limitation, a statement of income

and retained earnings of Borrower for such fiscal year prepared by a certified public accountant acceptable to Lender; and (ii) a statement of cash flows for Borrower for such fiscal year; prepared in conformity with GAAP, (except as otherwise consented to by the Lender, such consent not to be unreasonably withheld) on a basis consistent with that of the preceding year or containing disclosure of the effect on results of operation or cash flows of any change in the application of accounting principles during the year. Each such report shall also be accompanied by a compliance certificate prepared by Senior Management on a Lender approved form showing whether the provisions of Sections 6, 7 and 8 of this Agreement have been complied with and stating that to the best of Senior Management's knowledge during the course of their review nothing came to their attention that caused them to believe that Borrower failed to comply with the terms, covenants, provisions or conditions of Sections 6, 7 and 8 of this Agreement insofar as they relate to accounting matters.

(B)     Within thirty (30) calendar days after the end of each fiscal quarter of Borrower, Borrower's financial statements and certificates of the type described in Section 6.4(A) above prepared internally by Borrower's management (except as otherwise consented to by the Lender, such consent not to be unreasonably withheld) in accordance with past practice.

(C)     Not later than the twentieth (20th) calendar day following the end of each fiscal month, reports on accounts receivable aging, accounts payable aging and contract (job) status (including schedules regarding completed contracts and contracts in progress), each certified as being accurate by Senior Management of Borrower and in form and substance acceptable to Lender.

(D)     Promptly after the filing or receiving thereof, copies of all reports, including annual reports, and notices which Borrower or any ERISA Affiliate files with or receives from the Internal Revenue Service, the PBGC or the U.S. Department of Labor under the Code or ERISA.

(E)     Not later than twenty (20) days following the end of each month, Borrower shall submit to Lender a monthly borrowing base certificate in the form attached hereto (a "Borrowing Base Certificate") executed by the treasurer or the chief financial officer of Borrower, together with a schedule of Eligible Accounts certified as being accurate by the treasurer or the chief financial officer of Borrower.

(F)     Within one hundred twenty (120) days of Borrower's fiscal year end, Borrower's tax returns, including all schedules.

(G)     Within one hundred twenty (120) days of the end of each calendar year, a personal financial statement and tax returns, including all schedules, for

(H)    Such other information and at such time as Lender may reasonably request from time to time, but in no event later than thirty (30) days after Lender's request.

6.5    <u>Notices to Lender</u>.  Borrower will promptly give notice in writing to Lender of all litigation and/or governmental proceedings affecting it in which the amount involved is $50,000 or more, whether or not covered by insurance.

6.6    <u>Maintenance of Bank Accounts</u>.    Borrower will maintain its main operating and depository accounts with Lender.

6.7    <u>Maintenance of Property</u>.  Borrower will maintain its equipment, real estate and other properties, including the Collateral, in good condition and repair (normal wear and tear excepted), and will pay and discharge, or cause to be paid and discharged when due the cost of repairs to or maintenance of the same, and will pay or cause to be paid when due all rental or mortgage payments due on such real estate.

6.8    <u>Liability Insurance</u>.  Borrower shall at its expense, keep and maintain such public liability and third party property damage insurance in the minimum amount of $2,000,000 and with such deductibles as are reasonably acceptable to Lender and shall deliver to Lender the original (or a certified copy) of each policy of insurance and evidence of the payment of all premiums therefor.  Such policies of insurance shall contain an endorsement showing Lender as additional insured thereunder and shall provide that said policy cannot be terminated or amended without the insurer providing thirty (30) days prior written notice to Lender.

6.9    <u>Casualty Insurance</u>.  Borrower shall at Borrower's expense, keep and maintain its assets, including its buildings, machinery, equipment, Inventory and all its other tangible personal property, insured against loss or damage by fire, explosion and other hazards customarily insured under extended and unnamed perils coverage and such other risks ordinarily insured against by other prudent owners or users of such properties in similar businesses in an amount at least equal to the full insurable value of all such property and with such deductibles as are reasonably acceptable to Lender.  Borrower shall deliver to Lender the original (or a certified copy) of each policy of insurance and evidence of the payment of all premiums therefor.  All of the policies of insurance pertaining to Borrower's personal property assets (excluding Borrower's real property) shall contain an endorsement showing all losses payable to Lender as lender loss payee and otherwise in form and substance reasonably satisfactory to Lender and shall provide that such policy cannot be terminated or amended without the insurer providing **thirty (30)** days prior written notice to Lender.

6.10    <u>Attorney-In-Fact</u>.  Borrower hereby agrees to consult with Lender in making, adjusting, settling and receiving proceeds of claims under policies of insurance. If Borrower at any time or times hereafter shall fail to obtain or maintain any of the

thereto, then Lender shall have the right, but not the obligation, in Lender's sole discretion, to obtain and maintain such policies of insurance and pay such premiums and take any other action with respect thereto as Lender deems advisable, and all sums so expended **together with interest thereon at the rate prescribed in the Revolving Note** shall be part of the Obligations, payable ON DEMAND and otherwise repaid as provided herein and secured by the Collateral.

(A)    Borrower hereby assigns any and all other sums which may become payable under such property and casualty and liability insurance policies to Lender as additional security for the Obligations. Notwithstanding any other provision of this Agreement, provided Lender has not made Demand, Borrower shall have the right to use the proceeds of insurance to replace any inventory, equipment or, other personal property damaged by fire or other hazard covered by Borrower's casualty insurance. Any such insurance proceeds received by Lender shall be held as further security and Collateral hereunder, and Lender shall distribute such proceeds to Borrower as the costs of repair or replacement of the insured property or other expenses relating to such loss become due and payable by Borrower and thereafter shall promptly distribute to Borrower such amount of such proceeds as are not needed for repair or replacement; provided that if at any time there is in existence an Event of Default, any such insurance proceeds may, in Lender's sole discretion, be applied, in whole or in part, to the payment of any of the Obligations.

(B)    Borrower shall furnish Lender with certificates or other evidence satisfactory to Lender of compliance with the provisions of Sections 6.8 and 6.9.

6.11    Further Assurances.    At any time or from time to time upon Lender's request, Borrower shall execute and deliver, or cause to be executed and delivered, to Lender and/or such other Persons as Lender may reasonably request such further documents and instruments and do such other acts and things and provide such additional information and cooperation as Lender may reasonably request in order fully (i) to accomplish the purposes and carry out the tens of this Agreement, (ii) to be informed of Borrower's status and affairs, and (iii) to vest more completely in and assure to Lender its rights under this Agreement, the Revolving Note, any Related Agreements and in and to any Collateral, and otherwise to insure the continued perfection and priority of Lender's security interest and preservation of its rights therein. Such requests may include, without limitation, (i) agreements satisfactory to Lender to obtain "control" of any Investment Property, Deposit Accounts, Letter-of-Credit Rights or electronic Chattel Paper, and (ii) obtaining governmental or other third party consents, acknowledgments, waivers or approvals.

6.12    Losses, Etc.    Borrower shall promptly notify Lender in writing of any loss, theft, damage, destruction, encumbrance, levy, seizure or attachment of or on any of Borrower's assets if the asset is material to Borrower's business and has not been promptly replaced.

6.13  <u>Plan Funding</u>.  Borrower shall fund all of its "Defined Benefit Plans" (as defined in ERISA) in accordance with no less than the minimum funding standards of ERISA.

6.14  <u>Collection of Accounts</u>.  Borrower shall collect its Accounts Receivable and sell its Inventory only in the ordinary course of business.

6.15  <u>Payment of Indebtedness</u>.  Borrower will pay when due (or within applicable grace periods) all Indebtedness due third persons, except when the amount thereof is being contested in good faith by appropriate proceedings and with adequate reserves therefor being set aside on Borrower's books.

6.16  <u>Changes of Name and Location</u>.  Borrower shall notify Lender at least thirty (30) calendar days in advance of any change in (i) its entity name or any trade name, (ii) the state of its incorporation or formation, (iii) the location of any of Borrower's chief executive office, its principal place of business, any office or facility at which any Collateral is located, (iv) its Federal Identification Number, or of the establishment of any new, or the discontinuance of any existing, place of business.

6.17  <u>Field Audits</u>.  Lender shall have the right to audit the Collateral at such times (during normal business hours) as it reasonably deems appropriate.  The Borrower shall be responsible for the reasonable cost of one (1) audit per year; provided, however, Borrower shall be responsible for the cost of additional audits (at the prevailing cost) if Lender has made Demand.

6.18  <u>Inspection</u>.  Lender shall have the right upon reasonable notice to inspect Borrower's premises and books and records.

6.19  <u>Commercial Tort Claims</u>.  If Borrower shall at any time acquire a commercial tort claim, as defined in Article Nine, Borrower shall immediately notify Lender in a writing signed by Borrower of the brief details thereof and grant to Lender in such writing a security interest therein and in the proceeds thereof, all upon the terms of this Agreement, with such writing to be satisfactory to Lender in form and substance.

6.20  <u>Indemnification</u>.  Subject to the terms of the Credit Agreement, Borrower jointly and severally agrees to indemnify Lender and the other Lender Parties against, and hold each of them harmless from, any and all losses, claims, damages, liabilities and related expenses, including reasonable fees, disbursements and other charges of counsel, incurred by or asserted against any of them arising out of, in any way connected with, or as a result of, any claim, litigation, investigation or proceeding relating to the past, present and contemplated future use by Borrower (or by Lender or its designee as contemplated under Section 6.3 hereof) of any of Borrower's Intellectual Property, including without limitation, losses, claims, damages, liabilities and related expenses resulting for any alleged infringement upon or violation of any right, privilege or License of or with any other Person.

## SECTION 7.  NEGATIVE COVENANTS

So long as any Obligations remain outstanding and unpaid, Borrower shall not without Lender's prior written consent, which consent may be withheld in Lender's sole discretion:

7.1    No Liens.  Except for liens and encumbrances in favor of Lender and Permitted Encumbrances, create, assume or suffer to exist, any mortgage, pledge, encumbrance, lien, security interest or charge of any kind upon any of its Accounts, Inventory, machinery or equipment, real estate or other assets, whether now owned or hereafter acquired by Borrower.  Nothwithstanding the foregoing, Lender acknowledges that Borrower will work on projects which require Borrower to obtain a performance or completion bond, and such bonds, and the requirements and conditions thereto shall be permitted hereunder.

7.2    No Other Indebtedness.  Borrow funds from or otherwise incur or permit to exist any Indebtedness to any Person other than Lender, except Indebtedness incurred in connection with purchase money financings consented to by Lender and Indebtedness described on Schedule 5.13, and the agreements referenced in the letter agreement described in §3.6 above.

7.3    No Advances.  Make or suffer to exist any additional advances or loans to, or any investments (by transfers of property, contributions to capital, purchase of stock or securities or evidence of indebtedness or business or otherwise) in, any Person in excess of $25,000 in any aggregate amount outstanding at any time.

7.4    No Mergers, Change in Senior Management/Ownership Etc.  Merge or consolidate with or into any other Person, dissolve or liquidate; materially amend its certificate of incorporation or bylaws; change its name; enter into any reorganization re-capitalization; or reclassify its capital stock as debt or make any change in its Senior Management or ownership of its stock.  Notwithstanding the foregoing, upon prior written notice to Lender, Borrower may make acquisitions of other Persons which in the aggregate do not result in the expenditure of more than $500,000 (by cash, debt, stock swap or any combination thereof).

7.5    No Sales of Assets.  Except in the ordinary course of business, sell, exchange or otherwise dispose of a material part of its assets, or any part thereof, or any interest therein.  No reference to "Proceeds" in this Agreement authorizes any sale, transfer or other disposition of Collateral by Borrower.

7.6    No Contingent Liabilities.  Agree to purchase or repurchase or assume, guaranty, endorse, agree to supply funds in connection with, or otherwise become or remain liable in connection with the obligations, stock or dividends of any Person, except

for endorsement of negotiable instruments for collection or discount in the regular course of business.

7.7 <u>No Purchase of Margin Stock</u>. Directly or indirectly apply any part of the proceeds of the Loans to the purchase or carrying of any "margin stock" within the meaning of Regulation U of the Board of Governors of the Federal Reserve System, or any regulations, interpretations, or rulings thereunder.

7.8 <u>Fiscal Year</u>. Change its fiscal year without Lender's consent which shall not be unreasonably withheld.

7.9 <u>No Prepayment of Indebtedness</u>. Make any prepayment on any Indebtedness permitted by this Agreement, except Indebtedness to Lender and, in such case, pursuant to the terms of this Agreement, and the Revolving Note.

7.10 <u>No Untrue Statements</u>. Furnish Lender any certificate or other document that contains any untrue statement of material fact or that omits to state a material fact necessary to make such certificate or other document not misleading in light of the circumstances under which such certificate or other document was furnished.

7.11 <u>No Distributions</u>. So long as there is a balance under the Revolving Note greater than or equal to the amount contained in the Pledged Account pursuant to 3.6 hereof, Borrower shall not make any distributions to shareholders other than for Sub-S tax distributions to shareholders in the maximum amount of such shareholders' tax liability calculated at the shareholder's highest marginal federal tax rates.

## SECTION 8. FINANCIAL COVENANTS

[intentionally deleted]

## SECTION 9. LENDER'S REMEDIES

9.1 <u>Events of Default</u>. [intentionally deleted]

9.2 <u>Acceleration</u>. [intentionally deleted]

9.3 <u>Remedies</u>. Upon Demand, and without notice, Lender shall have, in addition to the rights and remedies given it by this Agreement, the Revolving Note and the Related Agreements, all those rights and remedies allowed by all applicable Laws, including the Uniform Commercial Code as enacted in any jurisdiction in which any Collateral may be located. Lender may pursue its rights and remedies as aforesaid without presentment, demand, protest, notice of protest or dishonor, or other notice of any kind, all of which are hereby expressly waived by Borrower, and without further action of any kind by Lender.

9.4    <u>Notice to Account Debtors and other Obligors</u>. Lender may, in its sole and absolute discretion, at any time or times after Demand is made, and without prior notice to Borrower, send a notice to Borrower's Account Debtors on Chattel Paper and General Intangibles and obligors on Instruments which Borrower is an obligee, notifying the Account Debtors that Borrower's Accounts Receivable have been assigned to Lender, that Lender has a lien thereon and, at Lender's option, that all payments upon Borrower's Accounts Receivable be made directly to Lender. After the making of such a request or the giving of any such notification, Borrower shall hold any proceeds of collection of Accounts, Chattel Paper, General Intangibles and Instruments received by Borrower as trustee for Lender without commingling the same with other funds of Borrower and shall turn the same over to Lender in the identical form received, together with any necessary endorsements or assignments. Lender shall apply the proceeds of collection of Accounts, Chattel Paper, General Intangibles and Instruments received by Lender to the Obligations in accordance with the Credit Agreement, such proceeds to be immediately entered after final payment in cash or solvent credits of the items giving rise to them.

9.5    <u>Additional Rights of Lender</u>. In addition to the foregoing but only at such time as Lender may exercise those remedies set forth in Section 9.3, Borrower hereby irrevocably appoints Lender (and all officers, employees or agents designated by Lender), coupled with an interest and with full power of substitution, as its attorney-in-fact for the purpose of taking any and all action appropriate to effectuate the terms of this Agreement, and to execute any and all documents necessary or desirable to carry out the same, including without limitation, without notice to or assent by Borrower:

(A)    to demand, collect, receive payment of, receipt for, settle, compromise or adjust, and give discharges and releases in respect of the Accounts Receivable or any of them;

(B)    to commence and prosecute any suits, actions or proceedings at law or in equity in any court of competent jurisdiction to collect the Accounts Receivable or any of them and to enforce any other rights in respect thereof or in respect of the goods which have given rise thereto;

(C)    to defend any suit, action or proceeding brought against the Borrower in respect of any Account Receivable or the goods which have given rise thereto:

(D)    to settle, compromise or adjust any suit, action or proceeding described in clause (b) or (c) above and, in connection therewith, to give such discharges or releases as the Lender may deem appropriate;

(E)    to endorse checks, notes, drafts, acceptances, money orders, bills of lading, warehouse receipts or other instruments or documents evidencing or securing the Accounts Receivable or any of them;

(F)     to receive, open and dispose of all mail addressed to the Borrower and to notify the post office authorities to change the address of delivery of mail addressed to the Borrower to such address, care of the Lender, as the Lender may designate; and

(G)     generally to sell, assign, transfer, pledge, make any agreement in respect of or otherwise deal with any Account Receivable or the goods or service which have given rise thereto, as fully and completely as though the Lender were the absolute owner thereof for all purposes, including contacting Account Debtors directly for verification or other purposes. The powers conferred on the Lender by this Agreement are solely to protect the interest of the Lender and shall not impose any duty upon the Lender to exercise any such power, and if the Lender shall exercise any such power, it shall be accountable only for amounts that it actually receives as a result thereof and shall not be responsible to the Borrower except for gross negligence and willful misconduct. The Lender shall be under no obligation to take steps necessary to preserve rights in any other Collateral against prior parties but may do so at its option. As its option the Lender may discharge any taxes, liens, security interests or other encumbrances to which any Collateral is at any time subject and may, upon the failure of the Borrower so to do, purchase insurance on any Collateral and pay for the repair, maintenance or preservation thereof, and the Borrower agrees to reimburse the Lender on demand for any payments made or expenses incurred by the Lender pursuant to the foregoing authorization, and authorizes the Lender to charge the Borrower for the amount of such payments or expenses. The Lender may at any time take control of any proceeds of Collateral to which the Lender is entitled hereunder or under applicable law. In addition, the Lender may require the Borrower to assemble any tangible personal property constituting Collateral and make it available to the Lender at a place to be designated by the Lender and which is reasonably convenient to the Borrower. The Borrower hereby grants to the Lender a nonexclusive irrevocable license in connection with the Lender's exercise of its rights hereunder, to use, apply and affix any trademark, tradename, logo or the like in which the Borrower now or hereafter has rights, which license may be used upon the occurrence of any of the Events of Default. The Lender may buy at any public sale, and if the Collateral is of a type customarily sold on a recognized market or the subject of widely distributed standard price quotations the Lender may buy at private sale.

9.6     No Marshalling; No Obligation to Pursue Others. Lender shall have no obligation to marshal any present or future collateral security (including, but not limited to, the Collateral) for, or other assurances of payment of, the Obligations or any of them or to resort to such collateral security or other assurances of payment in any particular order, and all of its rights hereunder and in respect of such collateral security and other assurances of payment shall be cumulative and in addition to all other rights, however existing or arising. To the extent that it lawfully may, Borrower hereby agrees that it will not invoke any law relating to the marshaling of collateral which might cause delay in or impede the

enforcement of Lender's rights under this Agreement or under any other instrument creating or evidencing any of the Obligations or under which any of the Obligations is outstanding or by which any of the Obligations is secured or payment thereof is otherwise assured, and, to the extent that it lawfully may, Borrower hereby irrevocably waives the benefits of all such laws.

9.7    Payment Set-Aside.    To the extent that Borrower or any other Person makes a payment or payments to Lender (whether hereunder, under any Note or under any of the other Loan Documents) with respect to the Obligations, or Lender enforces its security interests or rights or exercises its right of setoff, and such payment or payments or the proceeds of such enforcement or setoff or any part thereof are subsequently invalidated, declared to be fraudulent or preferential, set aside, recovered from, disgorged by or are required to be refunded, repaid or otherwise restored to Borrower or such Person, a trustee, receiver or any other person under any law (including, without limitation, any bankruptcy law, state or federal law, common law or equitable cause of action) in each case in connection with any bankruptcy or similar proceeding involving Borrower or such Person, then to the extent of any such restoration, the Obligations or part thereof originally intended to be satisfied shall be revived and continued in full force and effect as if such payment had not been made or such enforcement or setoff had not occurred, whereupon this Agreement shall be automatically reinstated without any further action by Borrower and Lender and continue to be fully applicable to such Obligations to the same extent as though the payment so repaid or recovered had never been originally made on such Obligation.

## SECTION 10. MISCELLANEOUS

10.1    Right of Set-Off.    Borrower hereby grants to Lender a lien on and a right of set-off (to be exercised pursuant to the sentence which follows this sentence) against all monies, deposits, securities and other property and the proceeds thereof, now or hereafter held or received by, or in transit to Lender or any entity under the direct or indirect control of Lender from or for Borrower, whether for safekeeping, pledge, custody, transmission, collection or otherwise, and all deposits (general or special, time or demand, provisional or final, or agency account), balances, sums and credits with and all of Borrower's claims against Lender at any time existing.    Lender may at any time, without demand or notice (such notice being expressly waived by the Borrower) following Demand apply the same or any part thereof to the Obligations or any part thereof, whether or not the Obligations are matured at the time of such application and regardless of the adequacy of any other Collateral securing such obligations.

10.2    Custody and Preservation of Collateral.    Lender shall have no duty beyond the safe custody thereof as to: (i) the collection or protection of any Collateral now or hereafter securing any Note or any Obligation or any income thereon; (ii) the preservation of rights against prior parties; or (iii) the preservation of any rights pertaining thereto.

Lender may exercise its rights with respect to any Collateral without resorting or regard to any other Collateral or any other sources of reimbursement for any Obligation.

10.3    Lender's Expenses.  Except as otherwise provided herein, Borrower shall, ON DEMAND, reimburse Lender for all of Lender's reasonable expenses, including reasonable fees and expenses of legal counsel for Lender, incurred in connection with the preparation, administration, amendment, modification, delivery or enforcement of this Agreement, the Revolving Note and/or the Related Agreements or the collection or attempted collection of the Revolving Note, including any such reasonable fees and expenses related to any federal bankruptcy proceeding and whether incurred prior or subsequent to any federal bankruptcy proceeding.

10.4    Enforcement and Waiver by Lender.  Lender shall have the right at all times to enforce the provisions of this Agreement, the Revolving Note and the Related Agreements in strict accordance with the terms hereof and thereof, notwithstanding any conduct or custom on the part of Lender in refraining from so doing at any time or times. Lender's failure or delay at any time or times to enforce its rights or remedies under such provisions strictly in accordance with the same shall not be construed as having created a custom in any way or manner contrary to the specific provisions of this Agreement or as having in any way or manner modified or waived the same.  No waiver of any provision of, or any of Lender's rights under, this Agreement, any Note, any Related Agreement or any other document or agreement now or hereafter relating to any of the Obligations and/or the Collateral, and no consent to any departure by any Person therefrom, shall be effective unless such waiver or consent is in writing and signed by an authorized officer of Lender, and then such waiver or consent shall be effective only in the specific instance and for the specific purpose for which such waiver or consent is given.  All of Lender's rights and remedies under this Agreement, any Note and/or any Related Agreement are cumulative and concurrent, and may be exercised singularly or concurrently and are not exclusive or in derogation of any other rights or remedies provided by Law or otherwise. Lender's exercise or partial exercise of one right or remedy shall not be deemed a waiver or release of and shall not preclude the further exercise of such right or remedy or any other right or remedy.

10.5    Waivers and Release.  To the maximum extent permitted by applicable Laws, to induce Lender to enter into the Loans evidenced by the Notes, this Agreement and the Related Agreements:

(A)    BORROWER ACKNOWLEDGES THAT EACH OF THE TRANSACTIONS CONTEMPLATED BY THIS AGREEMENT, THE REVOLVING NOTE, AND EACH OF THE RELATED AGREEMENTS IS A COMMERCIAL TRANSACTION, AND HEREBY EXPRESSLY AND IRREVOCABLY WAIVES TO THE MAXIMUM EXTENT PERMITTED BY APPLICABLE LAW ITS RIGHTS TO NOTICE AND HEARING BEFORE LENDER'S OR ANY OF LENDER'S SUCCESSORS OR ASSIGNS EXERCISE OF THE REMEDIES OF SELF-HELP, SET-OFF OR ANY SUMMARY PROCEDURE OR ANY OTHER PREJUDGMENT

REMEDY AND, EXCEPT WHERE REQUIRED BY THIS AGREEMENT OR ANY APPLICABLE LAW, NOTICE OF ANY OTHER ACTION TAKEN BY LENDER; and

(B)   BORROWER AND LENDER MUTUALLY EACH EXPRESSLY AND IRREVOCABLY WAIVES ANY RIGHT TO TRIAL BY JURY OF ANY CLAIM, DEMAND, ACTION OR CAUSE OF ACTION (i) ARISING UNDER THIS AGREEMENT, ANY RELATED AGREEMENT OR ANY OTHER INSTRUMENT, DOCUMENT OR AGREEMENT EXECUTED OR DELIVERED IN CONNECTION WITH THIS AGREEMENT, OR (ii) IN ANY WAY CONNECTED WITH OR INCIDENTAL TO THE DEALINGS OF THE PARTIES HERETO WITH RESPECT TO THIS AGREEMENT, ANY RELATED AGREEMENT OR ANY OTHER INSTRUMENT, DOCUMENT OR AGREEMENT EXECUTED OR DELIVERED IN CONNECTION WITH THIS AGREEMENT OR THE TRANSACTIONS RELATED HERETO OR THERETO, IN EACH CASE WHETHER NOW EXISTING OR HEREAFTER ARISING, AND WHETHER SOUNDING IN CONTRACT OR TORT OR OTHERWISE.   BORROWER AND LENDER SHALL NOT SEEK TO CONSOLIDATE ANY SUCH ACTION, IN WHICH A JURY TRIAL HAS BEEN WAIVED, WITH ANY OTHER ACTION IN WHICH A JURY TRIAL CANNOT BE OR HAS NOT BEEN WAIVED.

(C)   NONE OF LENDER, BORROWER, OR ANY AGENT OR ATTORNEY OF ANY OF THEM SHALL BE LIABLE TO ANY OF THE OTHERS FOR CONSEQUENTIAL DAMAGES ARISING FROM ANY BREACH OF CONTRACT, TORT, OR OTHER WRONG RELATING TO THE ESTABLISHMENT, ADMINISTRATION, OR COLLECTION OF THE OBLIGATIONS RELATING IN ANY WAY TO THIS AGREEMENT OR ANY OF THE OTHER LOAN DOCUMENTS, OR THE ACTION OR INACTION OF ANY OF SUCH PERSONS UNDER ANY ONE OR MORE HEREOF OR THEREOF.

(D)   IN THE EVENT LENDER SEEKS TO TAKE POSSESSION OF ANY OR ALL OF THE COLLATERAL BY COURT PROCESS OR OTHER METHOD AVAILABLE UNDER THE LAW, BORROWER IRREVOCABLY WAIVES ANY BOND AND ANY SURETY OR SECURITY RELATING THERETO REQUIRED BY ANY STATUTE, COURT RULE OR OTHERWISE AS AN INCIDENT TO SUCH POSSESSION, AND WAIVES ANY DEMAND FOR POSSESSION PRIOR TO THE COMMENCEMENT OF ANY SUIT OR ACTION TO RECOVER WITH RESPECT THERETO.

(E)   BORROWER ACKNOWLEDGES AND STIPULATES THAT THE WAIVERS AND AUTHORIZATIONS GRANTED ABOVE ARE MADE KNOWINGLY AND FREELY AND AFTER FULL CONSULTATION WITH COUNSEL.

10.6   Applicable Law.  This Agreement and each of the Revolving Note and the Related Agreements and the rights and remedies of the parties hereto and thereto shall be

governed by and construed and enforced in accordance with the Laws and decisions of the Commonwealth of Massachusetts without regard to conflict of laws principles.

10.7   <u>Jurisdiction and Service of Process</u>.  Except to the extent prohibited by applicable Laws:

(A)   Borrower agrees that (i) the execution of this Agreement, each Note and each Related Agreement and the performance of Borrower's Obligations hereunder and thereunder shall be deemed to have a Massachusetts situs; (ii) Borrower shall be subject to the personal jurisdiction of the courts of record of the Commonwealth of Massachusetts with respect to any suit, action or other legal proceeding arising out of this Agreement, any Note and/or any Related Agreement and/or the enforcement of any of the foregoing and/or any of the transactions contemplated by any of the foregoing; and (iii) any such suit, action or legal proceeding shall be brought by Lender and shall be brought by Borrower in the courts of record of the Commonwealth of Massachusetts or the courts of the United States located in the Commonwealth of Massachusetts;

(B)   Borrower hereby irrevocably consents to the jurisdiction of each such court in any such suit, action or other legal proceeding; and

(C)   Borrower hereby irrevocably waives any objection which it may have to the laying of venue of any such suit, action or other legal proceeding in any of such courts.

10.8   <u>Notices</u>.  Any notices or consents required or permitted by this Agreement shall be in writing (other than those which under the specific terms of this Agreement may be given by telephone, which shall be effective when received verbally) and shall be deemed delivered if hand-delivered or if sent by (i) certified mail, postage prepaid, return receipt requested, (ii) telecopy, or (iii) via a nationally-recognized overnight courier service (marked for next day delivery), as follows, unless such address is changed by written notice to each other party hereunder:

Borrower:           Boston Steel Erectors, Inc.
                    Boston Steel Erectors Holdings Trust
                    185 Squire Road, Suite 9
                    Revere, MA  02151

                    Boston Steel & Precast Erectors, Inc.
                    Boston Steel & Precast Erectors Holdings Trust
                    910R Broadway
                    Route 1 North
                    Saugus, MA 01906

With a Copy to:            Ronald Braunstein, Esq.
                          Riemer & Braunstein LLP
                          3 Center Plaza
                          Boston, MA 02108
                          Fax: 617-880-3456

Lender:                   Citizens Bank of Massachusetts
                          28 State Street
                          Boston, MA 02109
                          Attn: Scott McKechnie
                          Fax: 617-263-0442

With a Copy to:            Robinson & Cole LLP
                          One Boston Place
                          Boston, MA 02108
                          Attn: James B. Zuckernik, Esq.
                          Fax:    (617) 557-5999

10.9    Binding Effect, Assignment and Entire Agreement. This Agreement, the Revolving Note and each Related Agreement to which it is a party shall inure to the benefit of, and shall be binding upon, each of Borrower and Lender and their respective successors, permitted transferees and permitted assigns. Borrower shall not assign any of its rights or delegate any of its Obligations hereunder or under any Note or under any Related Agreement without Lender's prior written consent, and any such assignment in contravention of this Section 10.9 shall be null and void. This Agreement, the Revolving Note, the Related Agreements and the documents executed and delivered pursuant hereto and thereto, constitute the entire agreement between the parties with respect to the transactions contemplated by this Agreement, and supersede all prior written or oral understandings, agreements and commitments with respect to the subject matter hereof and/or thereof, all of which prior understandings, agreements and commitments are merged into this Agreement, the Revolving Note, and the Related Agreements. Except as specifically set forth in any Related Agreement, no amendment, modification or termination of any provision of this Agreement, any Note, any Related Agreement or any document or agreement now or hereafter relating to any of the Obligations and/or the Collateral shall be effective unless the same shall be contained in a writing signed by the parties to this Agreement and any other Persons who are parties to such Note, Related Agreement or other document or agreement. No notice to or demand on Borrower in any case shall entitle Borrower to any other or further notice or demand in similar or other circumstances.

10.10   Transfer of Lender's Interests.

        (A)    Assignments. Borrower hereby agrees that Lender, in its sole discretion, shall have the unrestricted right at any time and from time to time, and without Borrower's or any Guarantor's consent, to assign all or a portion of its rights and

institutions (each, an "Assignee"). In the event of any such assignment to an Assignee, Borrower and each Guarantor agrees that it shall execute, or cause to be executed, such documents, including without limitation, amendments to this Agreement, to any Note and to any other Security Document, as Lender shall deem necessary to effect the foregoing. In addition, at the request of Lender and any such Assignee, Borrower shall issue one or more new Notes, as applicable, to any such Assignee and, if Lender has retained any of its rights and obligations following such assignment, to Lender, which new Notes shall be issued in replacement of, but not in discharge of, the Obligations evidenced by the Notes prior to such assignment and shall reflect the amount of the respective Commitments and Loans held by such Assignee and Lender after giving effect to such assignment. Upon the execution and delivery of appropriate assignment documentation, amendments and any other documentation required by Lender in connection with such assignment, and the payment by Assignee of the purchase price agreed to by Lender and such Assignee, such Assignee shall be a party to this Agreement and shall have all of the rights and obligations of Lender hereunder (and under any and all other Notes and Security Documents) to the extent that such rights and obligations have been assigned by Lender pursuant to the assignment documentation between Lender and such Assignee, and Lender shall be released from its obligations hereunder and under any Note to a corresponding extent. Lender may furnish any information concerning Borrower in its possession from time to time to Assignees and prospective Assignees, **provided** that Lender shall require any such Assignees and prospective Assignees to agree in writing to maintain the confidentiality of such information, except as required by applicable laws or Governmental Authorities.

(B)   <u>Participations</u>.  Borrower hereby agrees that Lender, in its sole discretion, shall have the unrestricted right at any time and from time to time, and without Borrower's or any Guarantor's consent, to grant participating interests in its obligation to lend hereunder and/or all or any of the Loans held by Lender hereunder to one or more banks or other financial institutions (each, a "**Participant**"). In the event of any such grant by Lender of a participating interest to a Participant, Lender shall remain responsible for the performance of its obligations hereunder and Borrower shall continue to deal solely and directly with Lender in connection with Lender's rights and obligations hereunder.  Lender may furnish any information concerning Borrower in its possession from time to time to Participants and prospective Participants, **provided** that Lender shall require any such Participants and prospective Participants to agree in writing to maintain the confidentiality of such information, except as required by applicable laws or Governmental Authorities.

(C)   <u>Pledge to Federal Reserve Banks</u>.  Lender and each Assignee shall have the unrestricted right at any time and from time to time, and without Borrower's or any Guarantor's consent, to pledge all or any portion of its rights under this Agreement, any Note or any other Financing Agreement to any of the twelve (12) Federal Reserve Banks organized under Section 4 of the Federal Reserve Act, 12 U.S.C. Section 341, **provided** that no such pledge or enforcement thereof shall release Lender or such

10.11 . <u>Payment Dates</u>.  Whenever any payment to be made hereunder or under a Note shall be stated to be due on a calendar day other than a Banking Day, such payment may be made on the next succeeding Banking Day and such extension of time shall in such case be included in computing interest in connection with such payment, any Note or any Related Agreement.

10.12  <u>Severability</u>. ·If any provision of this Agreement, any Note or any Related Agreement shall be held invalid under any applicable Law, such invalidity shall not affect any other provision of this Agreement, such Note or such Related Agreement, as applicable, that can be given effect without the invalid provision, and, to this end, the provisions of each of this Agreement, each Note and each Related Document are severable.

10.13  <u>Captions</u>.  Captions for sections hereof are for convenience only and shall have no substantive effect, and do not define or limit the scope of any provision of this Agreement.

10.14  <u>Counterparts</u>.   This Agreement and each Related Agreement may be executed in any number of counterparts, each of which shall be deemed to be an original, but all of which together shall constitute but one and the same instrument, and this Agreement shall be effective when at least one counterpart of this Agreement or such Related Agreement, as applicable, has been executed by each party hereto or thereto. Delivery of an executed signature page to this Agreement by facsimile transmission shall be as effective as delivery of a manually signed counterpart of this Agreement.

10.15  <u>Successors and Assigns</u>.   The provisions of this Agreement shall be binding on and inure to the benefit of the respective successors and assigns of each party hereto.

[SIGNATURES ON FOLLOWING PAGE]

IN WITNESS WHEREOF, the parties hereto have duly executed this Agreement as of the day and year first above written.

*Boston Steel Erectors, Inc.*

By: _____
Its:  President and Treasurer

*Boston Steel & Precast Erectors, Inc.*

By: _____
Its:  President and Treasurer

*Boston Steel Erectors Holdings Trust*

By: _____
Its:  Trustee

*Boston Steel & Precast Erectors Holdings Trust*

By: _____
Its:  Trustee

COMMONWEALTH OF MASSACHUSETTS

Suffolk, SS.                                      January 29, 2002

Then personally appeared the above-named Robert Saraceno, of Boston Steel Erectors, Inc., and acknowledged the foregoing instrument to be the free act and deed of said Corporation, before me,

Notary Public  James B. Zuckerwik
My Commission Expires:  11\15\07

COMMONWEALTH OF MASSACHUSETTS

Suffolk, SS.                                      January 29, 2002

Then personally appeared the above-named Bernard MacInnis, Jr., of Boston Steel & Precast Erectors, Inc., and acknowledged the foregoing instrument to be the free act and deed of said Corporation, before me,

Notary Public  James B. Zuckerwik
My Commission Expires:  11\15\07

COMMONWEALTH OF MASSACHUSETTS

Suffolk, SS.                                      January 29, 2002

Then personally appeared the above-named Robert Saraceno, Trustee of Boston Steel Erectors Holdings Trust, and acknowledged the foregoing instrument to be the free act and deed of said ~~Corporation~~ Trust, before me,

Notary Public  James B. Zuckerwik
My Commission Expires:  11\15\07

COMMONWEALTH OF MASSACHUSETTS

Suffolk, SS.                                    January 29 , 2002

                                                    Trustee
   Then personally appeared the above-named Bernard MacInnis, Jr., of Boston Steel
& Precast Erectors Holdings Trust, and acknowledged the foregoing instrument to be the
free act and deed of said Corporation, before me,
              Trust

            Notary Public  James R. Zuckernik
            My Commission Expires:  11\15\07

Schedule 5.1

To Loan and Security Agreement

Corporate Existence
None

Schedule 5.8
To Loan and Security Agreement
Existing Defaults


None